Julian W. Wells (JW-4893)
RIKER, DANZIG, SCHERER, HYLAND
& PERRETTI LLP
500 Fifth Avenue, Suite 4920
New York, New York 10110
(212) 302-6574

-and-

RIKER, DANZIG, SCHERER, HYLAND
& PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962-1981
(973) 538-0800

Attorneys for Defendant
UBS Financial Services Inc.

| | |
|---|---|
| GERARD MURO,<br><br>Plaintiff,<br><br>vs.<br><br>UBS FINANCIAL SERVICES INC.,<br><br>Defendant. | UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK<br><br>Civil Action No. 07-CV-6492<br><br>Hon. Loretta A. Preska, U.S.D.J.<br><br>**DECLARATION OF<br>JULIAN WELLS, ESQ.** |

I, Julian Wells, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.     I am an attorney and member of the law firm of Riker, Danzig,

Scherer, Hyland & Perretti LLP, 500 Fifth Avenue, Suite 4920, New York, New York

10110.  I am admitted to practice law in the State of New York and before this Court.

My firm represents defendant UBS Financial Services Inc. ("UBS").  This Certification

is submitted in support of UBS's motion to dismiss plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6). I have personal knowledge of the facts set forth herein.

2.     Attached hereto as Exhibit A is a true and correct copy of Gorbaty v. Kelly, 2003 WL 21673627 (S.D.N.Y. July 17, 2003).

3.     Attached hereto as Exhibit B is a true and correct copy of the Statement of Claim, dated February 7, 2006, filed by Plaintiff Gerard Muro with the National Association of Securities Dealers, Inc., Office of Dispute Resolution, in the matter encaptioned Muro v. UBS Financial Services Inc., et al., Case No. 06-00612.

4.     Attached hereto as Exhibit C is a true and correct copy of  the Transcript of Proceedings taking place on April 19, 2007 in the matter encaptioned Muro v. UBS Financial Services Inc., et al., Case No. 06-00612.

5.     Attached hereto as Exhibit D is a true and correct copy of In Re Elevator Antitrust Litigation, --- F.3d ---, 2007 WL 2471805 (2d Cir. Sept. 4, 2007).

6.     Attached hereto as Exhibit E is a true and correct copy of Certain Underwriters at Lloyd's v. Mercer, 801 N.Y.S.2d 231 (Table), 2005 WL 841012 (N.Y. Sup. Ct. Apr. 12, 2005).

7.     Attached hereto as Exhibit F is a true and correct copy of Individual Sec., Ltd. v. Ross, 152 F.3d 918 (Table), 1998 WL 385835 (2d Cir. May 11, 1998).

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration was executed on September 14, 2007, within the United States of America.

```
                              s/ Julian Wells
                              Julian Wells
```

3790281.1

# EXHIBIT A

Not Reported in F.Supp.2d                                    Page 1
Not Reported in F.Supp.2d, 2003 WL 21673627 (S.D.N.Y.), 2003 Copr.L.Dec. P 28,676
**(Cite as: Not Reported in F.Supp.2d)**
H

Gorbaty v. Kelly
S.D.N.Y.,2003.

United States District Court,S.D. New York.
**Ben GORBATY, an Individual, Plaintiff,**
v.
**Kathleen KELLY, an Individual, Defendant.**
**No. 01 Civ. 8112(LMM).**

July 17, 2003.

Creator of art works brought copyright action
against co-creator, seeking a declaration that he was
a co-owner of joint works and the sole owner of
collective works. Following dismissal of creator's
original complaint for failure to identify the works
in which he claimed ownership, 2003 WL 355237,
co-creator moved for dismissal of the amended
complaint or for an order to compel arbitration. The
District Court, McKenna, J., held that: (1) terms of
representation agreement between creator and co-
creator did not bar creator's action, and (2)
arbitration award interpreting representation
agreement pursuant to arbitration clause did not bar
creator's action under doctrine of res judicata.

Motion denied.
West Headnotes
**[1] Copyrights and Intellectual Property 99 ⊜
41(3)**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(D) Ownership
            99k41 Ownership
                99k41(3)     k.     Joint     Works;
Contributions to Collective Works. Most Cited
Cases
Terms of representation agreement between creator
and co-creator who collaborated on artwork did not
bar creator's copyright action against co-creator,
seeking declaration that creator was co-owner of
joint works and sole owner of collective works;
only provision in agreement dealing with copyright
ownership defined work that was not at issue in
creator's action.

**[2] T ⊜ 380**

25T Alternative Dispute Resolution

25TII Arbitration
    25TII(H)    Review,    Conclusiveness,    and
Enforcement of Award
            25Tk380 k. Merger and Bar of Causes of
Action and Defenses. Most Cited Cases
        (Formerly 33k82(5) Arbitration)
Copyright action brought by creator of work against
co-creator, seeking declaration that he as creator was
co-owner of joint works and was sole owner of
collective works, was not barred by res judicata,
despite arbitration award interpreting parties'
representation agreement pursuant to arbitration
clause; no copyright-related claims were brought
before, considered by, or decided by arbitrator, and
creator's claims could not have been decided by
arbitrator because agreement covered works not at
issue in creator's action.

MEMORANDUM AND ORDER
MCKENNA, J.
*1 In the original complaint, North American
Thought Combine, Inc. ("Thought") and Ben
Gorbaty ("Gorbaty") sought a declaration that they
were co-owners of certain joint works with
defendant Kathleen Kelly ("Kelly") and the sole
owners of certain collective works. In a previous
decision, familiarity with which is assumed, the
Court dismissed the complaint with leave to replead.
*N. Am. Thought Combine, Inc. v. Kelly,* No. 01
Civ. 8112, 2003 WL 355237 (S.D.N.Y. Feb.18,
2003) (*"Kelly I"* ). Presently before the Court is a
motion brought by Kelly to dismiss the Amended
Complaint, or in the alternative, for an order to
compel arbitration. For the reasons set forth below,
Kelly's motions are denied.

BACKGROUND

The facts in the Amended Complaint are virtually
the same as those set out by the Court in *Kelly I,*
2003 WL 355237, at *1. However, the Amended
Complaint differs from the original in several ways.
First, Thought has been removed from the action
leaving Gorbaty as the sole plaintiff. Second,
plaintiff now alleges that the period of alleged
creation of the joint and collective works was
January 1999 through December 1999 (Am.Compl.¶
¶ 12, 14) as opposed to the dates listed in the
original complaint-September 1999 through August
2000 for the joint works (Compl.¶ 14) and April

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

Page 2

1992 through August 2000 for the collective works ( *Id.* ¶ 15). Finally, plaintiff Gorbaty has now identified the specific works alleged to be joint and collective works, and asserts the nature of the creative contributions that Gorbaty purportedly made. (Am.Compl.¶¶ 12-14.)

Kelly has moved to dismiss the Amended Complaint arguing that: a) copyright ownership in Kelly's works is expressly addressed by the representation agreement (Opp. Exh. B, the "Agreement") entered into between Thought and Kelly (Kelly Memo. at 8-10); and, b) the current action is precluded by either *res judicata* or collateral estoppel.FN1 (*Id.* at 10-11.) In the alternative, Kelly moves to compel arbitration, presumably pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4. (*Id.* at 11.)

FN1. A claim for *res judicata* or collateral estoppel is properly raised on a Rule 12(b)(6) motion. *Thompson v. County of Franklin,* 15 F.3d 245, 253 (2d Cir.1994).

### STANDARD OF REVIEW

Under Rule 12(b)(6), a complaint will be dismissed if there is a failure "to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). The Court must read the complaint generously accepting the truth of and drawing all reasonable inferences from well-pleaded factual allegations. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993) . "A court should only dismiss a suit under Rule 12(b)(6) if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' *Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994)(quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

On a Rule 12(b)(6) motion, courts may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference ... and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor,* 220 F.3d 81, 88-89 (2d Cir.2000) (citations omitted).

*2 When a defendant raises claim or issue preclusion, dismissal under Rule 12(b)(6) is appropriate when "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Conopco, Inc. v. Roll Int'l,* 231 F.3d 82, 86-87 (2d Cir.2000).

### DISCUSSION

#### I. The Agreement Does Not Address Copyright Ownership of the Works at Issue

[1] In its motion papers, Kelly argues that the Agreement bars this copyright action by Gorbaty because it "explicitly states what plaintiff's sole rights are in connection with [the works at issue]." (Kelly Memo. at 9.) This argument is not at all persuasive. Assuming *arguendo* that Gorbaty, as sole shareholder of Thought (Am.Compl.¶ 5), is personally bound by the contract entered into by Thought with Kelly, the only provision in the Agreement dealing with copyright ownership relates to creations defined in the Agreement as "the Work." FN2 Paragraph 4.2 provides as follows: "Thought acknowledges that [Kelly] is and shall remain the sole owner of the Work, and the sole owner of any trademarks, copyrights or related intellectual property rights with respect to the Work." (Agreement, ¶ 4.2.) The term "the Work" is defined in the Agreement as "certain character illustrations and three dimensional designs known collectively as 'The Critter Factory' and 'Beary Tiny Greetings'...." (Agreement at 1.) None of the joint or collective works listed by Gorbaty in the Amended Complaint appear to be "The Critter Factory" or "Beary Tiny Greetings." In fact, in his opposition papers, Gorbaty states, and Kelly does not dispute, that "[n]one of the joint works listed in [the Amended Complaint] is considered 'The Critter Factory' or 'Beary Tiny Greeting'." (Opp. at 10.) Thus, as far as the Court can tell, the Agreement is silent as to copyright ownership in the works at issue in this action.

FN2. Kelly attempts to argue that the term "Other Works" as defined in the Agreement also addresses the copyright ownership of the works in this action. (Kelly Memo. at 8-9.) This is simply not the case. The term "Other Works" is defined in the Agreement as "any other designs, characters, illustrations and creations, etc. created or owned by [Kelly]." (Agreement, ¶ 1.3.) Yet, this definition does not settle the question as to whether Kelly actually solely created or solely owns the works at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

Page   3

issue in this case.

## II. This Action is Not Precluded by the Arbitration Award

### A) The Arbitration Award

In October 2000, Thought brought a claim before an arbitrator with the American Arbitration Association based on a dispute with Kelly over the interpretation of the Agreement. (Opp. Exh. A, the "Arbitration Complaint".) FN3 The claim was brought pursuant to the Agreement's arbitration clause which provides that "[a]ny dispute or controversy arising between or among the parties hereto regarding any of the terms of this Agreement or the breach thereof ... shall be submitted to and determined by arbitration in accordance with the rules then obtaining of the American Arbitration Association." (Agreement, ¶ 11.)

FN3. As the arbitration complaint and award are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," Fed.R.Evid. 201(b)(2), the Court may take judicial notice of them and consider them in deciding the motion.

Thought's arbitration complaint sought relief for breach of contract, anticipatory repudiation of contract, fraudulent inducement, breach of good faith and fair dealing, and unjust enrichment. (Arbitration Compl. ¶¶ 10-27.) Thought also sought a declaratory judgment that the contract was valid and enforceable. (Id. ¶¶ 28-29.) The hearing was held on December 17 and 18, 2001 and the arbitrator rendered his decision on or about March 11, 2002. (Kelly Memo. at 1.)

*3 The arbitrator held that Thought "has a continuing right to act as [Kelly's] exclusive agent for the properties for which [Thought] secured a licensing agreement during the term of the Agreement, and to receive the compensation set forth in paragraph 5 of the Agreement." (Kelly Memo. Exh. B, the "Arbitration Award," ¶ 7.) Paragraph 5 of the Agreement states that Thought is entitled to receive and retain, inter alia, "forty percent (40%) of the gross receipts received by it in respect of Merchandising Rights to the Work." (Agreement, ¶ 5.) The arbitrator further held that because the Agreement had expired, Thought "does

not have a continuing right to represent all of Kelly's works or all of her 'whimsical works." ' (Id. ¶ 8.) Rather, the arbitrator concluded that Thought only has a continuing right to represent certain properties, which the arbitrator listed,FN4 that were licensed and sold during the term of the Agreement to Russ Berrie & Co. (Id. ¶ 6.) With respect to any other of Kelly's past or future works, she was deemed "free to make her own business arrangements." (Id. ¶ 8.)

FN4. None of the works listed by the arbitrator appear to be the same as the works in which Gorbaty claims ownership in this action.

### B) The Preclusive Effect of the Arbitration Award

[2] Determining the preclusive effect of this arbitration award requires an analysis of the common law doctrines of res judicata and collateral estoppel. FN5 It is well settled that both doctrines can bar the relitigation of certain claims and issues based on past determinations in arbitral proceedings. See Pike v. Freeman, 266 F.3d 78, 90-91 (2d Cir.2001); Jacobson v. Fireman's Fund Ins. Co., 111 F.3d 261, 267-68 (2d Cir.1997).

FN5. The parties have not indicated whether federal law or state law should govern the Court's determination of the preclusive effect of the arbitral award. This question is one that " 'has not been much developed." ' Pike v. Freeman, 266 F.3d 78, 91 n. 14 (2d Cir.2001) (quoting 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure, § 4475, at 772 (Supp.2001)). However, because there is no discernible difference between federal and New York law concerning res judicata and collateral estoppel, see Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir.2002), there is no need to choose between these sources of preclusion law.

To prove that a claim is precluded under the doctrine of res judicata, "a party must show that (1) the previous action involved an adjudication on the merits; (2) the previous action involved the [parties] or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." Pike, 266 F.3d at 91 (quoting Monahan v. New York City Dep't of Corr., 214 F.3d 275, 284-85 (2d Cir.2000) . Assuming for the sake of argument that the first

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

two prongs have been satisfied in this case,FN6 the Court finds that the third prong is not satisfied.

FN6. There is an issue of fact as to whether Gorbaty, as the sole shareholder of Thought, would even be bound by the preclusive effect of the arbitral award. He is technically a nonsignatory to the Agreement, and thus, to the agreement to arbitrate. It could be argued, however, that Gorbaty had the same pretrial opportunity to control the course of proceedings that would be available to a party. *See In re Teltronics Servs., Inc.,* 762 F.2d 185 (2d Cir.1985) ("A judgment against a corporation bars later litigation on the same cause of action by an officer, director, or shareholder of the corporation if the individual participated in and effectively controlled the earlier case.") On the other hand, because arbitration is a matter of contract, the preclusive effect of a previous arbitration may be limited solely to the corporate party. *See Kaplan v. First Options of Chicago, Inc.,* 143 F.3d 807, 815-16 (3d Cir.1998). In this case, however, the Court does not need to address this issue to decide the motion and thus makes no finding.

No copyright-related claims were brought before, considered by, or decided by the arbitrator.FN7 The question then becomes whether these claims *could* have been raised in the arbitration. An analysis of the scope of the arbitration clause in the Agreement, however, shows that these claims could not have been brought in the arbitration.FN8

FN7. This fact alone undermines Kelly's argument based on collateral estoppel. "Collateral estoppel, or issue preclusion, prevents parties or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding." *Marvel,* 310 F.3d at 288. Obviously, there can be no issue preclusion if, as is the case here, there has been no previous adjudication, or even consideration, of the issue.

FN8. It is for the Court, and not the arbitrator, to decide whether an arbitration clause applies to a particular controversy. *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 123 S.Ct. 588, 592, 154 L.Ed.2d 491 (2002).

The arbitration clause in the Agreement compels the arbitration of "[a]ny dispute or controversy arising between or among the parties hereto regarding any of the terms of this Agreement or the breach thereof...." (Agreement, ¶ 11.) Again, assuming *arguendo* that Gorbaty can be considered a party to the Agreement, as discussed earlier, the declaration of copyright ownership sought by Gorbaty in this case does not involve a dispute concerning the terms of or the breach of the Agreement. The Court is being asked to consider issues of copyright ownership that are beyond the scope of the Agreement. The Agreement dealt with the respective rights of the parties in the representation of Kelly's artwork in licensing negotiations, and except for "the Work," it does not even discuss copyright ownership. Thus, Gorbaty's claims in this action cannot be precluded by the decision rendered by the arbitrator, because they were not and, more importantly, could not have been brought before the arbitrator.

III. Motion to Compel Arbitration

*4 While the Court is mindful that any doubts concerning the scope of arbitrable issues must be resolved in favor of arbitration, as stated above, it is clear that the issues in this action are beyond the scope of the Agreement's arbitration clause. As the Second Circuit has stated, "arbitration should be ordered unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *McMahan Secs. Co. L.P. v. Forum Capital Markets L.P.,* 35 F.3d 82, 88 (2d Cir.1994) (quotation omitted). Because the arbitration clause "is not susceptible of an interpretation that covers the asserted dispute," the motion is denied.FN9

FN9. Again, for the purposes of this motion, the Court assumes *arguendo* that Gorbaty is bound by the arbitration clause of the Agreement.

CONCLUSION

For the foregoing reasons, the Court denies Kelly's motions for dismissal and to compel arbitration.

S.D.N.Y.,2003.
Gorbaty v. Kelly
Not Reported in F.Supp.2d, 2003 WL 21673627 (S.D.N.Y.), 2003 Copr.L.Dec. P 28,676

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# EXHIBIT B

NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.
OFFICE OF DISPUTE RESOLUTION

| | |
|---|---|
| GERARD MURO, | NASD Case No. _____ |
| Claimant, | |
| - *against* - | |
| UBS FINANCIAL SERVICES INC. f/k/a | STATEMENT OF CLAIM |
| UBS PAINEWEBBER INC. and | |
| PAINEWEBBER INC.; and | |
| MERRILL LYNCH, PIERCE, FENNER & | |
| SMITH INCORPORATED; and | |
| SCOTT MATTHEW GRENERT, | |
| Respondents. | |

Claimant Gerard Muro, for his claims against respondents UBS Financial Services Inc., formerly known as UBS PaineWebber Inc. and PaineWebber Incorporated; Merrill Lynch, Pierce, Fenner & Smith Incorporated; and Scott Matthew Grenert, respectfully states and alleges as follows:

THE PARTIES

1.      Claimant Gerard Muro ("Claimant") is a natural person residing at 41 Harbor Hill Drive, Lloyd Harbor, New York 11743-1030. Claimant is 65 years of age and retired from his career as an advertising executive in 2001 due to a disabling injury suffered in 1998. Claimant is not a sophisticated investor, but rather relies on investment professionals for advice and guidance in making his investment decisions.

2.      Respondent UBS Financial Services Inc., formerly known as UBS PaineWebber Inc. and PaineWebber Incorporated, is a Delaware corporation and a nationally known and established broker/dealer in the securities industry with its

principal office located at 1285 Avenue of the Americas, New York, New York 10019 in NASD District 10. Respondent UBS is a member firm of the National Association of Securities Dealers ("NASD"), CRD number 8174.

3.    Respondent Merrill Lynch, Pierce, Fenner & Smith Incorporated is a Delaware corporation and a nationally known and established broker/dealer in the securities industry with its principal office located at 4 World Financial Center, New York, New York 10281-1400 in NASD District 10. Respondent Merrill Lynch is a member firm of the NASD, CRD number 7691.

4.    Respondent Scott Matthew Grenert ("Grenert") is, on information and belief, a registered representative employed at relevant times herein by Merrill Lynch and UBS. Grenert's CRD number is 1675559. Upon information and belief, Grenert's current address is c/o RBC Dain Rauscher Inc., One Beacon Street, Boston, MA 02108

5.    Claimant requests that the hearing in this proceeding take place in New York, New York, which is the hearing office location nearest his residence.

FIRST COUNT
(Failure to Execute-Breach of Contract)

6.    Claimant repeats and realleges the allegations contained in paragraphs 1 through 5 above, as if fully set forth herein.

7.    Beginning in or about September 1999, Claimant maintained three brokerage accounts with respondent Merrill Lynch.

8.    In or about late 1999 Grenert, Claimant's account manager at respondent Merrill Lynch, then a registered representative of Merrill Lynch, left the employ of Merrill Lynch and joined respondent UBS as a Senior-Vice President of Investment, and thus became a registered representative of UBS.

2

9.    In or about early 2000, Grenert and UBS solicited Claimant to move his investment accounts from Merrill Lynch to UBS.

10.    Before agreeing to move his accounts to respondent UBS, Claimant had several discussions with Grenert concerning the appropriate investment strategies for Claimant's future. Claimant was extremely concerned that he was nearing retirement age and suffering from recent disability from a serious automobile accident, while holding a portfolio that was overly-concentrated in technology stocks and funds, and insufficiently diversified to provide him security in his retirement years. Grenert agreed that Claimant's portfolio was overly concentrated in technology issues and similarly risky issues and agreed that the portfolio required diversification.

11.    Grenert also agreed to provide Claimant with a timely and appropriate written plan to diversify his portfolio and agreed to limit commission on any technology stocks sold during diversification. Grenert further told Claimant that as soon as Claimant signed the forms required to transfer his securities into respondent UBS, Grenert would then immediately be able to enact transactions in the new account(s), even though the actual transfer "might take a few days."

12.    On or about February 8, 2000 Claimant executed and forwarded to Grenert the forms supplied by Grenert for the transfer of his securities from respondent Merrill Lynch to respondent UBS. At the time Claimant authorized and directed the transfer, the market value of the securities in his Merrill Lynch accounts was approximately $679,464.

13.    Despite Claimant's execution of the account transfer forms in early February 2000, the securities in his accounts at respondent Merrill Lynch were not

3

transferred into respondent UBS until a time period beginning April 15, 2000 and ending June 30, 2000.

14.    Upon information and belief, during March 2000, the value of the securities held in the Merrill Lynch accounts was as high as approximately $750,000. By the end of March 2000, the value of the securities held in the Merrill Lynch accounts had increased to $716,211. However, claimant was not able to trade or liquidate his holdings so as to take advantage of these increases because he was informed several times in February and March 2000 by Douglas Horn, the Merrill Lynch broker on his accounts, that the accounts were "in transfer" and no trading was possible.

15.    The value of the securities belatedly transferred into the UBS accounts from Merrill Lynch was $572,245.

16.    On information and belief, claimant's securities were not timely transferred from the Merrill Lynch accounts into the UBS accounts either because Merrill Lynch failed to timely process and administer the account transfer requests and forms, or because UBS did not timely process and administer the account transfer request and forms, or both.

17.    On information and belief, as a result of the delay in transferring claimant's securities from the Merrill Lynch accounts to the UBS accounts, plaintiff's securities were effectively kept in a state of limbo while the value of the securities decreased precipitously.

18.    Despite Grenert's promise to limit commissions, UBS failed to do so and instead charged full commissions.

19.    The foregoing activities which occurred with respect to claimant's accounts while they were maintained and improperly administered at UBS and Merrill Lynch constitute breaches of internal standards of conduct owing by the respondents to the Claimant, which are stated in respondents' own policy and procedures manuals or such other internal documents of both UBS and Merrill Lynch, as exist and apply in the circumstances. These standards and procedures, among other standards and procedures customary to the securities industry, are not being asserted here to be the underlying cause of action; the relevant case law states that these standards and procedures may be used to measure respondents' improper behavior. *Mauriber v. Shearson/American Express, Inc.*, 567 F. Supp. 1231, 1238 (S.D.N.Y. 1983)

20.    The foregoing wrongful activities, which occurred with respect to the Claimant's accounts while maintained and improperly administered at UBS and Merrill Lynch, constitute breaches of contractual duties owing by the respondents to the Claimant, including, without limitation, the contractual duties of good faith and fair dealing with the Claimant, and the contractual duties set forth in the customer agreements which specifically incorporate the applicable rules, regulations, usages and customs of the applicable exchanges, market or clearing houses that have been violated by respondents.

21.    By reason of the foregoing acts and omissions by respondents, claimant has been damaged in an amount to be proven upon the hearing of this proceeding, but that in any event is not less than $175,000

## SECOND COUNT
### (Unsuitability-Breach of Contract)

22.    Claimant repeats and realleges the allegations contained in paragraphs 1 through 21 above, as if fully set forth herein.

23.    Despite his promises, made on behalf of respondent UBS, Grenert failed to provide Claimant with a timely and appropriate written plan to diversify his portfolio.

24.    Despite the promises made by Grenert on behalf of respondent UBS, to advise and assist Claimant in obtaining and maintaining an appropriate mix of securities in his portfolio taking into account his financial situation and needs, Grenert and UBS failed to properly so advise or assist Claimant, with the result that his portfolio remained overly concentrated in securities that were not appropriate or suitable for his investment profile.

25.    Despite the promises made by Grenert on behalf of respondent UBS to advise and assist Claimant in obtaining and maintaining an appropriate mix of securities in his portfolio taking into account his age, imminent retirement and investment objectives, Grenert and UBS in fact recommended purchases of securities that were unsuitable for and inconsistent with those objectives.

26.    Claimant relied on the aforesaid recommendations in purchasing the unsuitable securities.

27.    The pattern of unsuitable trading as recommended by Grenert and UBS, and the failure to properly advise and assist Claimant with respect to the diversification of the account, violated the "know your customer" and suitability requirements which were applicable to the UBS accounts under the laws, rules, regulations and standards of

conduct in the securities industry, and those at UBS. Unsuitable purchases are actionable under several theories, including breach of contract and fraud.

28.    The foregoing activities which occurred with respect to claimant's accounts while they were maintained and improperly administered at UBS constitute breaches of internal standards of conduct owing by the respondents to the Claimant, which are stated in respondents' own policy and procedures manuals or such other internal documents of UBS , as exist and apply in the circumstances. These standards and procedures, among other standards and procedures customary to the securities industry, are not being asserted here to be the underlying cause of action; the relevant case law states that these standards and procedures may be used to measure respondents' improper behavior. *Mauriber v. Shearson/American Express, Inc.*, 567 F. Supp. 1231, 1238 (S.D.N.Y. 1983)

29.    The foregoing wrongful activities, which occurred with respect to the Claimant's accounts while maintained and improperly administered at UBS, constitute breaches of contractual duties owing by the respondents to the Claimant, including, without limitation, the contractual duties of good faith and fair dealing with the Claimant, and the contractual duties set forth in the customer agreements which specifically incorporate the applicable rules, regulations, usages and customs of the applicable exchanges, market or clearing houses that have been violated by respondents.

30.    By reason of the foregoing acts and omissions of Grenert and respondent UBS, claimant has been damaged in an amount to be proven upon the hearing of this matter, but that in any event is not less than $318,308.

7

## THIRD COUNT
### (Unsuitability-Common Law Fraud)

31.    Claimant repeats and realleges the allegations contained in paragraphs 1 through 30 above, as if fully set forth herein.

32.    UBS and Grenert knowingly made false representations of material fact or omitted to state material facts in recommending certain securities to be held or acquired by Claimant to be suitable for him, in that those securities were in fact unsuitable.

33.    Claimant relied on the superior knowledge and expertise of UBS and Grenert with respect to their recommendations for his portfolio.

34.    By reason of the foregoing, Claimant was damaged in an amount to be proven upon the hearing in this proceeding, but that in any event is not less than $318,308.

## FOURTH COUNT
### (Breach of Fiduciary Duties)

35.    Claimant repeats and realleges the allegations contained in paragraphs 1 through 34 above, as if fully set forth herein.

36.    Respondents owed Claimant certain fiduciary duties, including variously the duty to use care, and to properly supervise Grenert and the activity in Claimant's accounts.

37.    The foregoing wrongful acts and omissions, which occurred with respect to the Claimant's accounts while maintained and improperly administered at UBS, and Merrill Lynch, constitute breaches of fiduciary duties due and owing to Claimant by respondents, who were in positions of trust with respect to the Claimant.

38.   By reason of the foregoing, Claimant has been damaged in an amount to be proven upon the hearing in this proceeding, but that in any event is not less than approximately $493,308.

### FIFTH COUNT
#### (Breach of Supervisory Duties and Responsibilities)

39.   Claimant repeats and realleges the allegation contained in paragraphs 1 through 38 above, as if fully set forth herein.

40.   The foregoing wrongful acts and omissions, which occurred with respect to the Claimant's accounts while maintained and improperly administered at UBS and Merrill Lynch, were the subject of supervisory duties and responsibilities of respondents UBS and Merrill Lynch.

41.   Respondents UBS and Merrill Lynch had affirmative duties to supervise their registered agents and to periodically inspect the Claimant's accounts for evidence of, and to reasonably prevent, undue delay in transferring the accounts from Merrill Lynch to UBS. Respondent UBS had affirmative duties to supervise its registered agent and to periodically inspect the Claimant's accounts for evidence of, and to reasonably prevent, unsuitable investments and Grenert's failure to diversify and limit commissions as agreed. Instead of properly supervising Grenert and properly advising claimant, respondent UBS sought to mislead the claimant, and induce the claimant to ratify Grenert's conduct by failing to discuss concerns respondent UBS had or should have had with regard to such conduct, and, instead, purposefully supported Grenert and actively encouraged and supported the continuance of the pattern of such improper conduct, instead of properly supervising and curtailing it.

42.     Upon information and belief respondents UBS and Merrill Lynch failed with regard to their record keeping, supervisory duties and responsibilities over the Claimant's accounts, and are, accordingly, liable for the improper activity and improper administration that occurred while Claimant's accounts were maintained at UBS and Merrill Lynch, as a result of the act and omission stated herein.

43.     As a direct and proximate result of both respondents UBS's and Merrill Lynch's wrongful courses improper conduct and failure to supervise, Claimant has sustained damages in an amount to be proven upon the hearing of this proceeding.

WHEREFORE, Claimant respectfully requests that the Arbitration Panel make the following determinations:

A.  On the First Count, an award in favor of Claimant and against respondents Merrill Lynch and UBS, jointly and/or severally, in such amount as may be proven upon the hearing, but in any event not less than $175,000;

B.  On the Second Count, an award in favor of Claimant and against respondent UBS, in such amount as may be proven upon the hearing, but in any event not less than $318,308;

C.  On the Third Count, an award in favor of Claimant and against UBS and Grenert, jointly and severally, in such amount as may be proven upon the hearing, but in any event not less than $318,308;

D.  On the Fourth Count, an award in favor of Claimant and against respondent Merrill Lynch in such amount as proven upon the hearing but in any event not less than $175,000, and against

respondents UBS and Grenert, jointly and serverally in such amount as proven upon the hearing, but in any event not less than $493,308;

E.  On the Fifth Count, an award in favor of Claimant and against respondent Merrill Lynch in such amount as proven upon the hearing but in any event not less than $175,000, and against respondent UBS in such amount as proven upon the hearing, but in any event not less than $493,308;

F.  An award in favor of the Claimant and against all respondents, in an amount equal to the Claimant's costs, attorney's fees and forum fees associated with Claimant's attempt to recover his losses, together with interest on all items of compensatory damages as set forth above;

together with such other and further relief as the Arbitration Panel deems just, equitable and proper.

Dated: New York, New York
      February 7, 2006

EDWARD F. WESTFIELD, P.C.
Attorneys for Claimant

By: _____
      Edward F. Westfield
274 Madison Avenue, Suite 1601
New York, NY 10016-0701
(212) 532-6625

11

## NASD ARBITRATION UNIFORM SUBMISSION AGREEMENT

Claimant(s)

In the Matter of the Arbitration Between

Name(s) of Claimant(s)        GERARD MURO

and

Name(s) of Respondent(s)     UBS FINANCIAL SERVICES INC.;

MERRILL LYNCH PIERCE FENNER & SMITH INCORPORATED;
SCOTT M. GRENERT

1.  The undersigned parties hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, and all related counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

2.  The undersigned parties hereby state that they have read the procedures and rules of the sponsoring organization relating to arbitration.

3.  The undersigned parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). The undersigned parties further agree and understand that the arbitration will be conducted in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

4.  The undersigned parties further agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement and further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the undersigned parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5.  The parties hereto have signed and acknowledged the foregoing Submission Agreement.

_GERARD J MURO_
Claimant Name (please print)

_[signature]_                                          _2/6/06_
Claimant's Signature                                    Date

Claimant Name (please print)

Claimant's Signature                                    Date

**If needed, copy this page.**

23

# EXHIBIT C

STATE OF NEW YORK
NASD ARBITRATION HEARING

-----------------------X

IN THE MATTER OF:

    GERARD MURO,

               Claimant,

                                  Case No.:
                                  06-00612

       - Vs.

    UBS FINANCIAL SERVICES, INC.
    and SCOTT GRENERD,

               Respondents.

-----------------------X

               April 19, 2007

APPEARANCES:       EDWARD WESTFIELD, ESQ.
                     Attorney for Claimant

                     JOHN KAPLAN, ESQ.
                     Attorney for Respondent UBS

                     AMY BARD, ESQ.
                     Attorney for Respondent Grenerd

TRANSCRIBER:      Doreen Angermayr

I N D E X

| WITNESS | DIRECT | CROSS | RE DIRECT | RE CROSS | V. D. | J |
|---------|--------|-------|-----------|----------|-------|---|

E X H I B I T S

| PETITIONER | DESCRIPTION | | For I.D. | In Ev. |
|------------|-------------|--|----------|--------|

| RESPONDENT | DESCRIPTION | I.D. | IN EV. |
|------------|-------------|------|--------|

Ubiqus/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street – Suite 802, New York, NY 10007
Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7524

PROCEEDINGS                            3

1

2      THE COURT:  Good morning, everybody.

3   It's Thursday the 19th of March, 2007—I beg

4   your pardon, April, 2007.  This is day two of

5   the case 06-00612.  This is tape one, side

6   two of Thursday morning and it's Gerard Muro

7   versus UBS and Scott Grenerd [phonetic].

8      I see [unintelligible] that were here

9   yesterday except there's another gentleman

10  here today?

11     MR. JOHN KAPLAN:  Stephen Brown is the

12  branch manager of the Boston branch.  That's

13  the branch at issue in the cases.  He's

14  seated at the end of the table.  He is on our

15  witness list and is also UBS, obviously a UBS

16  employee.

17     THE COURT:  Right.  Mr. Brown.

18     MR. KAPLAN:  My hope, and I've discussed

19  this with Mr. Westfield, is to move Mr.

20  Brown's appearance up in the order of

21  witnesses and I think we may have touched on

22  this yesterday because otherwise we have two

23  branch people tied up here at this hearing.

24  Before—and with Mr. Westfield's permission, I

25  would call him, interrupt the cross-

PROCEEDINGS                              4

1

2    examination of Mr. Muro to call him.

3          THE COURT:  Right.

4          MR. KAPLAN:  Before that, I have an

5    application to make with respect to this case

6    based upon yesterday's events and I ask the

7    panel's indulgence to give it.

8          THE COURT:  Is Mr. Brown, is he a

9    witness?

10         MR. KAPLAN:  He is.

11         THE COURT:  I think he should wait

12   outside then in terms of your application.

13         MR. KAPLAN:  Okay, that's fine with me

14   if he waits outside.

15         [Pause]

16         The purpose of arbitration, as all of

17   you are very much aware, it's a privilege

18   that is granted both to members of the NASD

19   and to customers to avail themselves of these

20   facilities and to arbitrate their cases.

21   It's a way of getting a quick resolution.  We

22   all know the many advantages of arbitration

23   in order to avail yourself of these

24   facilities that we're sitting in today.

25   There are rules that govern these proceedings

PROCEEDINGS                    5

1
2    and with all respect, I do not believe this
3    client has honored and followed those rules.
4    And what I'm referring to, we spent a great
5    deal of time yesterday and each of the panel
6    members heard this claimant disavow
7    statements in his statement of claim.  Over
8    and over.  First it was days—and every
9    single—it wasn't an occasional inadvertent
10   error, it was a systematic ongoing
11   untruthfulness or inaccuracy in the Statement
12   of Claim.  And it was [unintelligible] by his
13   statement later on in the day that paragraph
14   14 of the Statement of Claim that his
15   allegation, which is central and probably the
16   most central allegation in this entire
17   Statement of Claim—this is a case essentially
18   about whether or not mistakes and errors were
19   made by Merrill Lynch or by UBS, Paine
20   Webber, in transferring this account.  His
21   central allegation here is that he, his
22   securities were effectively kept in a state
23   of limbo while the value of the securities
24   decreased precipitously—I'm reading from the
25   Statement of Claim.  The money that he's

1              PROCEEDINGS                      6

2    seeking here today runs from that claim.  In

3    his State of Claim, upon which UBS has relied

4    for 14 months, he said that the reason that

5    he wasn't trading or selling his

6    [unintelligible] to Oxy—which is, we've all

7    heard the heart and soul of what he's

8    claiming here, the reason he couldn't do that

9    is because Douglas Horn [phonetic], his

10   Merrill Lynch broker, told him, I can read

11   it, he was informed several times in February

12   and March 2000 by Douglas Horn, the Merrill

13   Lynch broker on his accounts, that the

14   accounts were in transfer and no trading was

15   possible.

16        That's the heart and soul of what he's

17   claiming here and we have defended this case,

18   we were prepared to come here to defend this

19   case based on that, the allegations in all of

20   the other paragraphs and it turns out that in

21   the course of the hearing yesterday, not at

22   the outset, not at the opening, not three

23   days ago, it's clear that they've known that

24   this is an inaccurate statement for quite a

25   long time according to the testimony of Mr.

Ubiqus/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street – Suite 802, New York, NY 10007
Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7524

PROCEEDINGS                    7

1

2      Muro, it's not clear how it is that it

3      remains in the Statement of Claim.  What I

4      know is that we've been relying on this.

5      I've sent out a Notice of Subpoena to Mr.

6      Horn to come in here so that we could refute

7      this, I think that's pending before the

8      panel, we haven't heard back, but

9      nonetheless, I built my defense to these

10     allegations based upon what I'm reading in

11     here and has have other attorneys and

12     employees of UBS who are trying to make some

13     sense of this claim.  And to have the

14     claimant say, oh, no, that was a mistake, I

15     told my lawyer that was a mistake—and think

16     about what the mistake is, I mean it's a very

17     specific sentence.  He was informed several

18     times in February and March 2000 by Douglas

19     Horn.  Douglas Horn is a Merrill Lynch broker

20     as it says, the next word, Merrill Lynch

21     broker on his accounts.  When this State of

22     Claim was filed, Merrill Lynch was a

23     defendant in this case and he had a very

24     important and good reason to go after Doug

25     Horn and Merrill Lynch.  They were suing

PROCEEDINGS                8

1

2  Merrill Lynch for this money.  But they've

3  settled with Merrill Lynch.  Merrill Lynch is

4  not here today, we don't see them.  They've

5  settled their case with Merrill Lynch.  And

6  suddenly, with Merrill Lynch gone, oh, it

7  wasn't Doug Horn that said those bad things,

8  it was Scott Grenerd, it was Scott Grenerd.

9  Well, that is just not fair.  It's a lie,

10  it's in the Statement of Claim, we've relied

11  on it.

12      I can go on about the other things in

13  the Statement of Claim but I think the panel

14  has heard the gist of what I'm saying.  Under

15  Rule 10305, the arbitration code reads at any

16  time during the course of an arbitration, the

17  arbitrators may either upon their own

18  initiative or at the request of a party,

19  dismiss the proceeding and refer the parties

20  to their judicial remedies.  It's without

21  prejudice.  It means this claimant can go to

22  court, bring this case, his statute of

23  limitations arguments to the extent they're

24  valid, would be just as valid in court

25  because the filing of this action tolls any

PROCEEDINGS                    9

1

2      statute of limitation.  Therefore, if

3      February 6th, 2006 was early enough to bring

4      this action then, it would still be good in

5      court.  And I think, given what's happened

6      here, that this action, pursuant to 10305,

7      should be [background noise] under, for the

8      reasons that I just stated.  It's just not

9      right to allow a claimant to abuse the NASD

10     process and then come back and expect to have

11     three or four more days, which is what we're

12     facing here, three more days of testimony.

13     I've got a branch manager, I've got an

14     operations manager, there will be others—I'm

15     bringing over somebody from our

16     [unintelligible] department—It's not right in

17     light of the abuse that we have seen here,

18     and outright admissions of falseness in the

19     Statement of Claim.  To use these facilities

20     under the auspices of the NASD, it's a

21     privilege, it's been abused, I move for

22     dismissal of this action.

23          MR. EDWARD WESTFIELD:  May I respond?

24          THE COURT:  Certainly.

25          MR. WESTFIELD:  With respect to the

PROCEEDINGS                    10

1

2    inaccurate statement that was in the

3    Statement of Claim, Mr. Muro admits that it

4    was inaccurate, he in fact did tell me it was

5    inaccurate, not early on but around the time

6    we did responses to discovery requests.  I

7    thought I had corrected it.  I searched, I

8    was [background noise] searching for what I

9    thought I had written and I haven't been able

10   to find it so I assume that I didn't, despite

11   best intentions, did not correct that

12   statement.  So to the extent the fault is

13   with anyone, it's with me on that.

14        The fact is that this is a part of the

15   claim and it's not the only allegation about

16   which Mr. Muro is complaining and a dismissal

17   at this point, after we've had a full day of

18   hearings, I think is premature.

19   [Unintelligible] hear from the witnesses,

20   hear from the rest of Mr. Muro's cross-

21   examination and redirect and if the panel

22   wants to make a determination after that, I

23   think that might, you know, I wouldn't argue

24   that, but at this point I think it's, the

25   motion is premature and I think there's

PROCEEDINGS                    11

1
2    certainly no intent to mislead and no purpose

3    in misleading.  There were two brokers

4    involved here, there was a confusion, I made

5    a mistake and I didn't timely correct it.

6    But I don't think that should be visited on

7    the claimant in this case because the--

8    everyone is here to testify to what their

9    recollections are, Mr. Grenerd is here, he

10   can testify what his recollection is, if Mr.

11   Horn wants to come in, I don't think it's

12   necessary, but he can testify as well since

13   he is subpoenaed, and that, I think the

14   record is not irreparably damaged here so I

15   would ask that the panel either deny the

16   motion or hold it in abeyance.

17        MR. KAPLAN:  I don't know how many times

18   we're going to hold motions in abeyance.  Of

19   course the panel is free to put off and

20   consider motions at any point in time.

21   That's evident and needn't be said.  For Mr.

22   Westfield to say that there's no irreparable

23   harm when we had already prepared a case

24   based on facts that we believed were the true

25   facts.  And I have to say, if—it's now on the

PROCEEDINGS                    12

1

2      record that this error was known at least in

3      the early stages of discovery or late stages

4      of discovery, that's quite a long time ago.

5      The discovery cutoff in this case was three

6      months ago.  And certainly at the outset of

7      this hearing, Mr. Westfield and Mr. Muro

8      could have presented us with an Amended

9      Statement of Claim and they, and there was no

10     mention of that.  Had I not asked the

11     question to Mr. Muro on cross-examination, I

12     don't think we'd know right now sitting here.

13     But there is an outright falsehood in the

14     Statement of Claim that is material and

15     germane to the central issue in this case.  I

16     think that there are not many circumstances

17     that warrant dismissal but I think this is

18     one of them.  I also think we have a rule,

19     10305, that generously permits claimant to

20     keep his claims alive.  This is not the end

21     of his case.  But the sanction for what's

22     happened here is that he ought to be referred

23     to his other judicial remedy, which is the

24     court remedy, and let's let a court rather

25     than this building and this panel be burdened

PROCEEDINGS                    13

1

2          with this case.  It's not right.

3               THE COURT:  Well, I think it's

4          [unintelligible]

5     [OFF THE RECORD]

6     [ON THE RECORD]

7               THE COURT:  Okay.

8               MR. KAPLAN:  If you prefer, before we go

9          back on the record, we can explain what it is

10         about—

11              THE COURT:  [Interposing] Oh, okay.

12              MR. KAPLAN:  --what it is we're about to

13         do or we can leave—

14    [OFF THE RECORD]

15    [ON THE RECORD]

16              THE COURT:  We're going to reconvene now

17         with regard to case 06-00612.  We removed the

18         motion that was pending and there is now a

19         decision by the parties.

20              MR. KAPLAN:  John Kaplan on behalf of

21         the respondent UBS Financial Service and

22         speaking also on behalf of respondent Scott

23         Grenerd.  [Unintelligible] panel that,

24         following our motion this morning seeking

25         dismissal of this arbitration proceeding

PROCEEDINGS                                    14

1

2    pursuant to Rule 10305 of the Code of

3    Arbitration Procedure, the parties have

4    reached an agreement with respect to

5    disposition of that motion and of this

6    arbitration and I'd like to read the

7    agreement into the record that we have

8    reached.  Just something that affects this

9    agreement and these proceedings.  There's

10   been a recent change in the NASDs governing

11   arbitration rules that took effect on April

12   16th and the parties are in agreement and I

13   think the panel will take knowledge that the

14   old rules are in effect with respect to this

15   proceeding, the change in rules apply only to

16   proceedings commenced after April 16th.  This

17   was commenced long before that date.  These

18   rules cite Rule 10305A which is a rule in the

19   old Code of Arbitration Proceedings that may

20   or may not exist anymore or may be numbered

21   differently in the new rules.  I'm referring

22   to old Rules 10305A.

23          FEMALE VOICE:  John, can I just

24   interject?  With respect to Scott Grenerd—

25          THE COURT:  [Interposing] Would you just

PROCEEDINGS                    15

1

2          state your name?

3              MS. AMY BARD [phonetic]:  This is Amy

4          Bard.  And with respect to Scott Grenerd, the

5          dismissal is going to be pursuant to 10305B

6          which is with prejudice.  So I just—you keep

7          referring to A but I just wanted to mention

8          that we are also calling upon the 10305B

9          statute as well.

10             MR. WESTFIELD:  John, may I see that

11         booklet?

12             MR. KAPLAN:  Amy, you didn't make a

13         motion pursuant to 10305B and I understood I

14         was responding to the motion pursuant to

15         10305A.  So what I am doing with respect to

16         Mr. Grenerd is a consensual dismissal and not

17         a dismissal as a sanction in any way which is

18         what 10305B talks about.  So—

19             MS. BARD:  Okay, so then we'll clarify

20         that with—okay.

21             MR. KAPLAN:  It is a dismissal with

22         prejudice but not a dismissal with prejudice

23         for a sanction for willful and intentional

24         material failure to comply with the order of

25         the arbitrators.  That's not what the

PROCEEDINGS                          16

1

2      [background noise].

3          I'm not going to cite what we've written

4      down in the agreement, with my apologies

5      because the way it's written, if I may have

6      to go slowly and re-read certain sections to

7      clarify what's been written down here.

8          The parties agree to a dismissal of this

9      arbitration—

10         THE COURT:  [Interposing] Do you need

11     the number?

12         MR. KAPLAN:  Yes.

13         THE COURT:  06-00612.

14         MR. KAPLAN:  The parties agree to a

15     dismissal of arbitration 06—

16         THE COURT:  [Interposing] Dash 00612.

17         MR. KAPLAN:  -00612 pursuant to Rule

18     10305A of the pre-April 16th, 2007 Code of

19     Arbitration Procedure.  I'd like to read from

20     the Code of Arbitration Procedure 10305A,

21     Dismissal of Proceedings.

22         At any time during the course of an

23     arbitration, the arbitrators may either upon

24     their own initiative or at the request of a

25     party, dismiss the proceeding and refer the

1

2    parties to their judicial remedies or to any

3    dispute resolution forum agreed to by the

4    parties without prejudice to any claims or

5    [background noise].

6         And we've gone on to agree to the

7    following in addition to point one, the

8    dismissal, in point two, the costs of this

9    arbitration shall be shared equally by the

10   parties, the parties being UBS and Gerard

11   Muro, not Mr. Grenerd.  With the exception

12   that UBS agrees to pay up to $1,500 of

13   claimant's NASD [unintelligible] fees.  Those

14   fees have not yet been assessed.  When they

15   are, we will share them equally except that

16   $1,500 of claimant's fees will be paid by

17   UBS.

18        The third point in our agreement is that

19   respondent, Scott M. Grenerd is dismissed

20   with prejudice by claimant Gerard Muro.

21        MS. BARD:  And I'm going to interject

22   one more time just so it's clear on the

23   record.  So with respect to Scott Grenerd,

24   this dismissal is not pursuant to 10305.

25   This is a voluntary dismissal by the claimant

1                          PROCEEDINGS                    18

2          against Scott Grenerd with prejudice.

3                MR. WESTFIELD:  And without cost except

4          as set forth in the agreement.

5                MS. BARD:  Right.

6                MR. KAPLAN:  The dismissal as against

7          UBS Financial Services is without prejudice,

8          and that brings us to point four, which is

9          that any court action brought by Muro against

10         UBS must be commenced within 90 days of April

11         19th, 2007.  The exclusive jurisdiction of

12         that action, if it is brought, shall be the

13         Southern District of New York, Federal Court,

14         located in the Southern District of New York.

15         In that action, if it is brought, UBS does

16         not waive any defense based upon the statute

17         of limitations or any other defense that was

18         raised in this action.

19               After the expiration of 90 days from

20         April 19th, 2007, if no action has been

21         commenced in the Southern District of New

22         York as set forth herein, all claims against

23         UBS by Mr. Muro, are dismissed with

24         prejudice.

25               That was the fourth point in our

PROCEEDINGS                    19

1

2     agreement—

3          THE COURT:  [Interposing] I have that as

4     the fifth.

5          MS. BARD:  No, that's the fourth.

6          MR. KAPLAN:  The fifth, as I have it

7     enumerated, is that Scott Grenerd will not

8     bring any claim against Gerard Muro with

9     respect to liable, slander, malicious

10    prosecution or any similar claim arising in

11    the connection with the allegations in this

12    arbitration.

13         Number six on our list:  UBS, Gerard

14    Muro, agree that any rulings in this

15    arbitration by the panel shall not be binding

16    in any subsequent court proceeding.

17         Number seven.  All testimony given under

18    oath in this arbitration proceeding shall be

19    admissible in the Federal court proceeding if

20    brought, subject to the rules and procedures

21    of the Federal court.

22         Number eight.  Gerard Muro will

23    cooperate in any proceeding brought by Scott

24    Grenerd seeking expungment of the claims

25    against Grenerd brought in this proceeding.

PROCEEDINGS                          20

1

2      This agreement to cooperate is made without

3      prejudice to claimant's right to make

4      statements or adduce evidence concerning

5      Grenerd's activities as a financial

6      consultant to claimant to the extent claimant

7      pursues a further claim against UBS.  That's

8      eight.

9          And number nine.  Counsel for UBS and

10     Muro will consult as to disposition and use

11     in any further proceeding of discovery

12     materials produced in this proceeding and

13     will make good faith efforts to resolve any

14     disputes.

15         And that is the entire, our agreement

16     read into the record.

17         THE COURT:  Okay.  Is that your—

18         MR. WESTFIELD:  [Interposing] May I have

19     a second?

20  [OFF THE RECORD]

21  [ON THE RECORD]

22         THE COURT:  All right.  So now if you'd

23     like to just—

24         MR. KAPLAN:  [Interposing] Yes.

25         THE COURT:  --describe where we are or

PROCEEDINGS                    21

1

2    withdraw some things—

3        MR. KAPLAN:  [Interposing] Yes.  We have

4    read the agreement into the record and the

5    agreement stands as read.  There was some

6    discussion off the record among the parties

7    and each other and for the respondents, this

8    is John Kaplan speaking.  We are comfortable

9    with the agreement.  I'd like to get a

10    representation directly from the claimant on

11    this record that he is entirely comfortable

12    with this agreement, understands it and has,

13    he is not going to challenge this agreement

14    because I have real concerns based on the off

15    the record discussions that we just had that

16    Mr. Muro may not fully understand the

17    agreement or may not fully abide by it.  And

18    obviously it's a binding agreement.  I want

19    him to understand that it is an agreement to

20    which he is a party and I would ask that the

21    panel find an appropriate way to make certain

22    that all concerned parties here at the table

23    sign on for this agreement, whether it's in

24    ink or whether it's by words with an

25    acknowledgement that binds us to this

PROCEEDINGS                              22

1

2       agreement.

3            MR. WESTFIELD:  And maybe I could do

4       that by asking Mr. Muro a few questions.

5            THE COURT:  Certainly.

6            MR. WESTFIELD:  Mr. Muro, you heard the

7       agreement that we have read into the record,

8       correct?

9            MR. MURO:  Correct.

10           MR. WESTFIELD:  Okay.  Does it express

11      your agreement as we've so far—as reached in

12      this disposition of this arbitration

13      agreement?

14           MR. MURO:  I agree with it.

15           MR. WESTFIELD:  And you fully understand

16      it?

17           MR. MURO:  I fully understand it.

18           THE COURT:  And are you comfortable—

19      excuse me asking you this—with your

20      attorney's explanation and do you understand

21      all of it?

22           MR. MURO:  I do.

23           THE COURT:  Completely.

24           MR. MURO:  Yes.

25           THE COURT:  Good.

PROCEEDINGS                                    23

1

2          MR. WESTFIELD:  Okay.  And—

3          THE COURT:  [Interposing] Is there

4    anything in writing that you—

5          MR. KAPLAN:  [Interposing]

6    [Unintelligible] on behalf—

7          THE COURT:  [Interposing] Right.  Is

8    there anything that you would like to have as

9    a side writing between the two of you or—

10         MR. WESTFIELD:  [Interposing] No, I

11   think I'd like to rely on the record because

12   I think on the tape record, and we'll

13   probably order it because I think Mr. Kaplan

14   did an excellent job of locution and I think

15   that, you know, if we just acknowledge on the

16   record that the agreement as read into the

17   record is binding, I think that's fine.

18         THE COURT:  Because you both have

19   [unintelligible] a copy if you want to just

20   sign that—

21         MR. WESTFIELD:  [Interposing] It's such

22   an ugly paper—

23         MR. KAPLAN:  [Interposing] I agree with

24   Mr. Westfield that [unintelligible]

25   signature.  Sometimes when individuals,

Ubiqus/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street – Suite 802, New York, NY 10007
Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7524

PROCEEDINGS                    24

1

2    whether it's a claimant or respondent are

3    parties to agreements like these, and they're

4    not attorneys, they can be confused by the

5    language or the concepts and that was the

6    reason for this—Mr. Grenerd is in the same

7    position.  He is a party to this proceeding,

8    he's represented by counsel but he's an

9    individual so maybe he should put on the

10   record as well that he understands the

11   consequences of this agreement, the

12   dismissal, et cetera, and that way, I mean,

13   I'm comfortable but counsel understands the

14   agreement that we worked on together and that

15   includes Miss Bard, Mr. Westfield and myself.

16   Individuals at the table who are bound by

17   this agreement who aren't lawyers, maybe we

18   should have on the record.

19        THE COURT:  Right.  So we can ask Mr.

20   Grenerd then the same—

21        MR. KAPLAN:  [Interposing]

22   [Unintelligible] appropriate questions.

23        MS. BARD:  Mr. Grenerd, did you heard

24   the agreement that was read into the record?

25        MR. GRENERD:  I did.

PROCEEDINGS                    25

1

2      MS. BARD:  And did you have an

3   opportunity to discuss the terms of that

4   agreement with me?

5      MR. GRENERD:  I did.

6      MS. BARD  Okay.  And are you fully

7   comfortable with the terms of the agreement?

8      MR. GRENERD:  I am.

9      MS. BARD:  And do you have any questions

10   about the agreement that we haven't covered?

11      MR. GRENERD:  No.

12      MS. BARD:  Okay.  So you're—and you're,

13   you have agreed to it, you consented to it;

14   is that correct?

15      MR. GRENERD:  I completely

16   [unintelligible].

17      THE COURT:  All right, good.  So then

18   you'll forward this to NASD [unintelligible]

19   anything to do with this.

20      MR. KAPLAN:  I think we'll see—

21      MR. WESTFIELD:  [Interposing] I think

22   the dismissal piece of it is something the

23   panel can order pursuant to this agreement.

24   There's been an agreement to dismiss pursuant

25   to Rule 10305 as to UBS and that there's been

PROCEEDINGS                        26

1

2     a dismissal with prejudice not pursuant to

3     any NASD rule but pursuant to consent

4     agreement as to Mr. Grenerd.

5          THE COURT:  Right.

6          MR. WESTFIELD:  [Unintelligible] just

7     referring to the record on this.

8          MS. BARD:  And I would just ask that Mr.

9     Westfield send a letter to the NASD notifying

10    the NASD that dismissed with respect to Scott

11    with prejudice so that—

12         MR. WESTFIELD:  [Interposing] Yes.

13         MS. BARD:  Yes.

14         MR. KAPLAN:  It might as well also

15    recite the dismissal [background noise] of

16    UBS.  Because from the NASDs perspective—

17         [Crosstalk]

18         THE COURT:  We need to get—

19         MR. WESTFIELD:  [Interposing] We'll do

20    the letter and ask them to forward it to you

21    as well.

22         THE COURT:  Okay.  That's excellent

23    then—

24         MR. WESTFIELD:  [Interposing] Thank you

25    very much.

PROCEEDINGS                    27

1

2      THE COURT:  No, no, I want to thank all

3  of you too.  Let me just see if there's

4  anything further that I need to tell you.

5  [Pause].  All right.  So it's good that you

6  reached a settlement here and also that the

7  record, of course, is going to stay open

8  until the panel actually writes this up and

9  you hear from NASD, but at this point it's

10  all agreed upon and you all stated on the

11  record that you understand this and it's

12  acceptable.

13      MR. KAPLAN:  Yes.

14      MR. WESTFIELD:  Edward Westfield for

15  claimant, yes.

16      MR. JOHN KAPLAN:  John Kaplan for

17  respondent UBS Financial Services, Inc., yes.

18      MS. AMY BARD:  And Amy Bard for

19  respondent Scott Grenerd, yes.

20      THE COURT:  Well, thank you very, very

21  much.

22      [Crosstalk]

23      MR. WESTFIELD:  I want to thank opposing

24  counsel and his team.

25      [END TRANSCRIPT]

28

<u>C E R T I F I C A T E</u>

I, Doreen Angermayr certify that the foregoing

transcript of proceedings in the Matter of Gerard Muro

v. UBS Financial Services, Inc. and Scott Grenerd,

Case No. 06-00612 was prepared using standard

electronic transcription equipment and is a true and

accurate record of the proceedings.


Tape 1, Side B

Counter #s 0:01 to 30:11

Signature:  Doreen Angermayr

Date:  June 4, 2007

29

ERRATA SHEET FOR TRANSCRIPT OF _____

RE: _____    DATE TAKEN: _____

PAGE      LINE #      CORRECTION      REASON

_____

WITNESS' NAME

SUBSCRIBED AND SWORN TO THIS

_____ DAY OF _____, 200____

_____