Julian W. Wells (JW-4893)
RIKER, DANZIG, SCHERER, HYLAND
& PERRETTI LLP
500 Fifth Avenue, Suite 4920
New York, New York 10110
(212) 302-6574

-and-

RIKER, DANZIG, SCHERER, HYLAND
& PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962-1981
(973) 538-0800

Attorneys for Defendant
UBS Financial Services Inc.

|  |  |
|---|---|
| GERARD MURO,<br><br>        Plaintiff,<br><br>        vs.<br><br>UBS FINANCIAL SERVICES INC.,<br><br>        Defendant. | UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK<br><br>Civil Action No. 07-CV-6492<br><br>Hon. Loretta A. Preska, U.S.D.J.<br><br>**EXHIBITS D & E TO<br>DECLARATION OF<br>JULIAN WELLS, ESQ.** |

# EXHIBIT D

--- F.3d ----
Page 1

--- F.3d ----, 2007 WL 2471805 (C.A.2 (N.Y.))

(Cite as: --- F.3d ----)

H

In re Elevator Antitrust Litigation

C.A.2 (N.Y.),2007.

Only the Westlaw citation is currently available.

United States Court of Appeals,Second Circuit.

**In re ELEVATOR ANTITRUST LITIGATION.**
**Transhorn, Ltd., 1775 Housing Associates,**
**Rochdale Village, Inc., Birmingham Building**
**Trades Towers, Inc., Triangle Housing**
**Associates, L.P., Bay Crest Condominium**
**Association, Olen Commercial Realty Corp.,**
**Riverbay Corp., 181 Maple Avenue Associates,**
**D.F. Chase, Inc., Lenox Road Associates and**
**Towers of Coral Springs Ltd., Plaintiffs-**
**Appellants,**
**Joseph M. Bennardi, doing business as Building**
**Supers of Camden, Inc., doing business as**
**Nedmac Management, Inc., Consolidated-**
**Plaintiff-Appellant,**
v.
**United Technologies Corporation, Otis Elevator**
**Company, Kone Corporation, Kone, Inc.,**
**Schindler Holding, Ltd., Schindler Elevator**
**Corporation, Thyssenkrupp AG, Thyssenkrupp**
**Elevator Capital Corp., and Thyssenkrupp**
**Elevator Corp., Defendants-Appellees.**
**Docket No. 06-3128-CV.**

Argued: June 14, 2007.
Decided: Sept. 4, 2007.

Appeal from a judgment entered by the United States District Court for the Southern District of New York (Griesa, J.) on June 6, 2006, granting defendants-appellees' motion to dismiss the complaint and denying leave to replead. We affirm.

Eric Alan Isaacson (Mark Solomon, Christopher M. Burke, David W. Mitchell, Tami Falkenstein Hennick, on the brief), Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP, San Diego, CA, for Plaintiffs-Appellants.

Mary Jane Fait, Wolf Haldenstein Adler Freeman & Herz, LLP, New York, NY, for Plaintiffs-Appellants.

Nadeem Faruqi, Antonio Vozzolo, Beth A. Keller, Faruqi & Faruqi, LLP, New York, NY, for Plaintiffs-Appellants.

Mark Leddy (Leah Brannon, on the brief), Cleary Gottlieb Steen & Hamilton, LLP, Washington, DC, for Defendants-Appellees United Technologies Corporation and Otis Elevator Company.

Kenneth M. Kramer (Jerome S. Fortinsky, Paula Howell, on the brief), Shearman & Sterling LLP, New York, NY, for Defendants-Appellees Schindler Holding Ltd. and Schindler Elevator Corporation.

Gerald Zingone (Michael Evan Jaffe, on the brief), Thelen Reid Brown Raysman & Steiner LLP, Washington, DC, for Defendants-Appellees Kone Corporation and Kone, Inc.

Terry Myers (Anthony A. Dean, on the brief), Gibbons Del Deo, Dolan, Griffinger & Vecchione, P.C., New York, NY, for Defendant-Appellee ThyssenKrupp AG.

Scott Martin (Christopher V. Roberts, on the brief), Weil Gotshal & Manges LLP, New York, NY, for Defendants-Appellees Thyssenkrupp Elevator Capital Corp., and Thyssenkrupp Elevator Corp.

A. Paul Victor, Dewey Ballantine LLP, New York, NY, for Defendants-Appellees Thyssenkrupp Elevator Capital Corp., and Thyssenkrupp Elevator Corp.

Before JACOBS, Chief Judge, STRAUB and B.D. PARKER, Circuit Judges.

PER CURIAM:

**\*1** This appeal is taken from a judgment of the United States District Court for the Southern District of New York (Griesa, J.), dismissing a complaint alleging that defendant elevator companies conspired to engage in anticompetitive conduct in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 *et seq.* (the "conspiracy claims"), and that they unilaterally monopolized and attempted to monopolize the maintenance market for their elevators, in violation of Section 2 of the Sherman Act (the "unilateral-monopolization claims"). We affirm. The conspiracy claims provide no plausible ground to support the inference of an unlawful agreement, and the allegations of unilateral monopolization fail to allege a prior course of dealing. Finally, the district court did not abuse its discretion by refusing leave to amend the complaint.

I

Plaintiffs represent a putative class of persons who "purchased elevators and/or elevator maintenance and repair services from defendants," sellers of elevators and maintenance services.FN1 2d Am. Compl. ¶¶ 5, 20-28. The complaint alleges that:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



FN1. Defendants are: United Technologies Corporation and Otis Elevator Company (collectively "Otis"); Kone Corporation and Kone, Inc. (collectively "Kone"); Schindler Holding Ltd. and Schindler Elevator Corporation (collectively "Schindler"); ThyssenKrupp AG, ThyssenKrupp Elevator Corporation, and ThyssenKrupp Elevator Capital Corporation (collectively "Thyssen").

(1) Defendants conspired to fix prices for the sale and the continuing maintenance of elevators, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (Count I);
(2) Defendants conspired to monopolize the markets for the sale and maintenance of elevators, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (Count II); and
(3) Each defendant unilaterally monopolized and attempted to monopolize the maintenance market for its own elevators by making it difficult for independent maintenance companies (and each other) to service each defendant's elevators, in violation of Section 2 of the Sherman Act (Counts III-X).FN2

FN2. Counts III and IV are against Otis, V and VI, Kone; VII and VIII, Schindler; and IX and X, Thyssen.

As to the conspiracy claims, plaintiffs allege that, beginning in 2000, defendants agreed:

to suppress and eliminate competition in the sale and service of elevators by fixing the price of elevators [and] replacement parts and services, rigging bids for contracts for elevator sales, allocating markets and customers for elevator sales and maintenance services, and rigging bids for contracts for elevator maintenance and repair services.

2d Am. Compl. ¶ 41. Plaintiffs assert that the conspiracy was undertaken (and its effects felt) in Europe as well as in the United States, and that the conspiracy was effected by price fixing, bid rigging, and collusion to drive independent repair companies out of business.2d Am. Compl. ¶¶ 41-43. The complaint references various investigations into alleged antitrust violations by defendants and their affiliates, one in Italy (1998) and another by the European Commission (2004).2d Am. Compl. ¶¶ 62-69.

As to the unilateral-monopolization claims, plaintiffs assert that each defendant monopolized the

maintenance market for its own elevators by such measures as interfering with delivery of replacement parts and intentionally designing their elevators to require proprietary maintenance tools which are not made available to competing service companies ( *e.g.,* embedded computer systems that can only be interfaced with defendant-controlled handheld units). 2d Am. Compl. ¶¶ 50-57.

*2 The district court granted defendants' Rule 12(b)(6) motion to dismiss on the ground that the claims lacked the requisite factual predicate. *In re Elevator Antitrust Litig.,* No. 04 Civ. 1178, 2006 WL 1470994 (S.D.N.Y. May 30, 2006). The court denied leave to re-plead and entered judgment in favor of defendants. *Id.* at *12. This appeal followed.

II

We review the district court's grant of a Rule 12(b)(6) motion *de novo, see In re Tamoxifen Citrate Antitrust Litig.,* 466 F.3d 187, 200 (2d Cir.2006), *cert. denied,* 127 S.Ct. 3001 (2007), "draw[ing] all reasonable inferences in plaintiffs' favor," *Freedom Holdings Inc. v. Spitzer,* 357 F.3d 205, 216 (2d Cir.2004) and accepting as true all the factual allegations in the complaint, *see Roth v. Jennings,* 489 F.3d 499, 501 (2d Cir.2007).

We affirm the district court's dismissal of the conspiracy claims because plaintiffs are unable to allege facts that would provide "plausible grounds to infer an agreement," *Bell Atlantic Corp. v.. Twombly,* 127 S.Ct. 1955, 1965 (2007). "Considerable uncertainty" surrounds the breadth of the Supreme Court's recent decision in *Twombly. Iqbal v. Hasty,* 490 F.3d 143, 155 (2d Cir.2007). But we need not draw fine lines here; our precedents support application of *Twombly* to the conspiracy claims asserted under both Section 1 and Section 2. FN3 To survive a motion to dismiss under *Twombly,* it is not enough to make allegations of an antitrust conspiracy that are consistent with an unlawful agreement; to be viable, a complaint must contain "enough factual matter (taken as true) to suggest that an agreement [to engage in anticompetitive conduct] was made." *Twombly,* 127 S.Ct. at 1965 (citation and internal quotation marks omitted). While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to "nudge[plaintiffs'] claims across the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



line from conceivable to plausible." FN4 *Twombly*, 127 S.Ct. at 1974.

FN3. A narrow view of *Twombly* would have limited its holding to the antitrust context, or perhaps only to Section 1 claims; but we have concluded that *Twombly* affects pleading standards somewhat more broadly. *See Iqbal*, 490 F.3d at 157 ("We are reluctant to assume that all of the language of *Bell Atlantic [v. Twombly]* applies only to section 1 allegations based on competitors' parallel conduct or, slightly more broadly, only to antitrust cases."); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, --- F.3d ----, No. 05-5132, 2007 WL 1989336, at *15 n. 2 (2d Cir. July 11, 2007) ("We have declined to read *Twombly's* flexible 'plausibility standard' as relating only to antitrust cases." (citing *Iqbal*, 2007 WL 1717803, at * 11)).

FN4. The potentially enormous cost of fact discovery was cited as a factor in *Twombly;* the Court explained that, while judges should "be cautious before dismissing an antitrust complaint in advance of discovery," they must also keep in mind that "proceeding to antitrust discovery can be expensive." *Id.* at 1966-67. Accordingly, district courts " 'retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.' " *Id.* at 1967 (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n. 17 (1983) ).

Plaintiffs argue that a plausible inference can be drawn from three sources in the complaint: [A] averments of agreements made at some unidentified place and time; [B] averments of parallel conduct; and [C] evidence suggesting anticompetitive wrongdoing by certain defendants in Europe. These allegations are insufficient to establish a plausible inference of agreement, and therefore to state a claim.

[A] *Conclusory Allegations of Agreement.* As the district court observed, the complaint enumerates "basically every type of conspiratorial activity that one could imagine .... The list is in entirely general terms without any specification of any particular activities by any particular defendant[; it] is nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever." FN5 *In re Elevator Antitrust Litig.,* 2006

WL 1470994, at *2-*3 (citing 2d Am. Compl. ¶¶ 43, 78, 85). Such "conclusory allegation[s] of agreement at some unidentified point do [ ] not supply facts adequate to show illegality." *Twombly*, 127 S.Ct. at 1966; *cf. Amron v. Morgan Stanley Inv. Advisors Inc.,* 464 F.3d 338, 344 (2d Cir.2006) (concluding that, in resisting a motion to dismiss, "bald assertions and conclusions of law will not suffice").

FN5. Specifically, plaintiffs assert that, in order to effect the conspiracy, defendants:
(a) Participated in meetings in the United States and Europe to discuss pricing and market divisions;
(b) Agreed to fix prices for elevators and services;
(c) Rigged bids for sales and maintenance;
(d) Exchanged price quotes;
(e) Allocated markets for sales and maintenance;
(f) "Collusively" required customers to enter long-term maintenance contracts; and
(g) Collectively took actions to drive independent repair companies out of business.
2d Am. Compl. ¶ 43.

*3 [B] *Parallel Conduct.* Plaintiffs argue that certain parallel conduct evinces a conspiracy, such as similarities in contractual language, pricing, and equipment design.2d Am. Compl. ¶¶ 41-42, 61-70. But these allegations do not constitute "plausible grounds to infer an agreement" because, while that conduct is "consistent with conspiracy, [it is] just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 127 S.Ct. at 1964. Similar contract terms can reflect similar bargaining power and commercial goals (not to mention boilerplate); similar contract language can reflect the copying of documents that may not be secret; similar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy; and similar equipment design can reflect the state of the art. "An allegation of parallel conduct ... gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* at 1966 (internal quotation marks omitted).

[C] *European Misconduct.* Plaintiffs assert that the conspiracy claims are rendered plausible by specific factual allegations of defendants' apparent anticompetitive misconduct in Europe. (The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



--- F.3d ----
(Cite as: --- F.3d ----)

particulars are set out in the margin.FN6) The European misconduct is alleged to reflect the existence of a worldwide conspiracy; and even if the misconduct took place only in Europe, it is alleged that the market in elevators is a "global market, such that prices charged in the European market affect the prices in the United States and vice versa." FN7 2d Am. Compl. ¶ 61.

FN6. Plaintiffs allege: that the Italian Antitrust Authority and the European Commission have initiated investigations into possible wrongdoing by the defendants, 2d Am. Compl. ¶¶ 62-66; that the European Commission raided the offices of each defendant and issued a statement that it "has good reason to believe that the manufacturers [including ... Kone Corporation, Schindler Holding, and ThyssenKrupp AG] may have shared between themselves the tenders for sale & installation of elevators ... and may have colluded to restrict competition with regard to after-sales services, 2d Am. Compl. ¶ 66; that news reports claim that UTC and Kone Corporation have admitted wrongdoing by some of its European employees, 2d Am. Compl. ¶¶ 67-69; and that (subsequent to the filing of the complaint) extraordinary fines have been levied by the European Commission against defendants and their affiliates for various antitrust violations. [Pl. Ltr. Br. (June 6, 2007) at 3].

FN7. Plaintiffs allege: that the "effects [of defendants' conspiracy] were felt by plaintiffs ... in the United States," that "the prices charged in the European market affect the prices in the United States and vice versa," and that pricing in Europe and the United States is "intertwined."

Plaintiffs provide an insufficient factual basis for their assertions of a worldwide conspiracy affecting a global market for elevators and maintenance services. Allegations of anticompetitive wrongdoing in Europe-absent any evidence of linkage between such foreign conduct and conduct here-is merely to suggest (in defendants' words) that "if it happened there, it could have happened here." And, regarding the nature of the elevator market, plaintiffs offer nothing more than conclusory allegations: for example, there are no allegations of global marketing or fungible products, *see Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267, 1270 (D.C.Cir.2005), no indication that participants monitored prices in other markets, *see Dee-K*

*Enters., Inc. v. Heveafil Sdn. Bhd,* 299 F.3d 281, 295 (4th Cir.2002), and no allegations of the actual pricing of elevators or maintenance services in the United States or changes therein attributable to defendants' alleged misconduct. *See generally Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir.2001) ("To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes-analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." (citations and internal quotation marks omitted)). Without an adequate allegation of facts linking transactions in Europe to transactions and effects here, plaintiffs' conclusory allegations do not "nudge[ their] claims across the line from conceivable to plausible." FN8 *Twombly*, 127 S.Ct. at 1974.

FN8. Because the pleadings do not state a claim, we need not consider the extra-territorial reach of the Sherman Act. *See Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993) ("[T]he Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States.").

### III

*4 It is also alleged that each defendant unilaterally employed "exclusionary conduct" to acquire and attempt to acquire a monopoly in the maintenance market for its own elevators, such as: designing the elevators to prevent servicing by other providers (including each other); refusing to sell competitors the parts, tools, software or diagrams necessary to service the elevators; and obstructing competitors' attempts to purchase elevator parts.2d Am. Compl. ¶¶ 51-58. Thus, plaintiffs contend that defendants' refusal to deal with third-party maintenance providers violates Section 2 of the Sherman Act.2d Am. Compl. ¶¶ 89, 94, 100, 106, 112, 118, 124, 130. But because plaintiffs do not allege that defendants terminated any prior course of dealing-the sole exception to the broad right of a firm to refuse to deal with its competitors-the allegations are insufficient to state a unilateral-monopolization claim.

In *Verizon Commc'ns v. Trinko*, 540 U.S. 398 (2004), the Supreme Court explained that a refusal to deal with competitors does not typically violate §

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



2:

Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers. Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law.... [C]ompelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion. Thus, as a general matter, the Sherman Act "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal."

*Id.* at 407-08 (quoting *United States v. Colgate & Co.,* 250 U.S. 300, 307 (1919)); *see also MetroNet Servs. Corp. v. Qwest Corp.,* 383 F.3d 1124, 1131 (9th Cir.2004). Here, obvious commercial interests would justify a competitor in assuring its own control over the maintenance of the elevators it markets, because maintenance is important in upholding the product's reputation for reliability and safety (no small considerations when it comes to elevators).

*Trinko* cautioned that the right to refuse to deal, while capacious, is not unlimited: " 'The high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified.' " 540 U.S. at 408 (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 601 (1985)). Observing that it has been "very cautious" in creating exceptions to the right to refuse to deal, the *Trinko* Court noted a sole exception, set forth in the earlier case of *Aspen Skiing,* which *Trinko* described as situated "at or near the outer boundary of § 2 liability." *Id.* at 409. That exception applies when a monopolist seeks to terminate a prior (voluntary) course of dealing with a competitor. *Id.* (observing that "[t]he refusal to deal alleged in the present case does not fit within the limited exception recognized in *Aspen Skiing.* The complaint does not allege that Verizon voluntarily engaged in a course of dealing with its rivals...."). The *Trinko* Court explained the relevance of a prior course of dealing in antitrust analysis: "The unilateral termination of a voluntary ( *and thus presumably profitable* ) course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end." *Id.* (emphasis in original).

*5 Plaintiffs argue that *Trinko* only applies where there is a "pervasive regulatory scheme," which diminishes the likelihood of antitrust harm. In arriving at its holding, *Trinko* did address the telecommunications regulatory scheme, along with at least two other considerations, which militated against creating further exceptions to the right of refusal to deal. *Id.* at 412-14. But these considerations were not essential to *Trinko's* holding. And neither of two other Supreme Court cases dealing with this exception involves a regulated industry. *See Aspen Skiing,* 472 U.S. at 587 (ski resorts); *Eastman Kodak Co. v. Image Technical Servs.,* 504 U.S. 451 (1992) (photocopiers).

The limited nature of this exception to the right of refusal to deal is further supported by *Eastman Kodak.* After five years working with independent service organizations ("ISOs") to provide maintenance services on Kodak copiers, Kodak suddenly implemented a policy of refusing to do business with the ISOs; as a result, "ISOs were unable to obtain parts ... and many were forced out of business." *Id.* at 458. The Court concluded that "[i]f Kodak adopted its [refusal to deal] policies as part of a scheme of willful acquisition or maintenance of monopoly power, it will have violated § 2." *Id.* at 483. While *Eastman Kodak* does not expressly say that a Section 2 claim premised on a refusal to deal cannot survive absent a prior course of dealing, it was decided in that fact context, and has been read to support that proposition:

[Initially,] Kodak sold copiers that customers could service themselves (or through independent service organizations). Having achieved substantial sales, Kodak then moved to claim all of the repair work for itself. That change had the potential to raise the total cost of copier-plus-service above the competitive level-and ... above the price that Kodak could have charged had it followed a closed-service model from the outset.

*Schor v. Abbott Labs.,* 457 F.3d 608, 614 (7th Cir.2006), *cert. denied,* 127 S.Ct. 1257 (2007).

The unilateral-monopolization claims in this case do not fall within the sole exception to the right of refusalto-deal: the complaint does not allege that defendants terminated a prior relationship with elevator service providers-a change which (by taking

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



--- F.3d ----
(Cite as: --- F.3d ----)

advantage of their customers' sunk costs) could evince monopolistic motives.

### IV

We review a district court's denial of a motion to amend for abuse of discretion. *See Gorman v. Consol. Edison Corp.,* 488 F.3d 586, 592 (2d Cir.2007). The district court concluded that plaintiffs' second amended complaint (at issue here) contains as much specificity as plaintiffs can muster consistent with Federal Rule of Civil Procedure 11. FN9 *In re Elevator Antitrust Litig.,* No. 04 Civ. 1178, 2006 WL 1470994, at *12 (S.D.N.Y. May 30, 2006). Based on the record before us, we cannot say that this conclusion falls outside the district court's discretion.

FN9. At argument in district court, an attorney for plaintiffs suggested that she knew of facts supporting more specific allegations of misconduct in the United States; but when pressed as to the substance of those facts, or for an explanation for why they don't appear in the complaint, she replied: "Your honor, I really don't feel at liberty to [disclose the information]. It is confidential."

\* \* \*

*6 Plaintiffs' remaining arguments are less substantial and without merit. The judgment of the district court is affirmed.

C.A.2 (N.Y.),2007.
In re Elevator Antitrust Litigation
--- F.3d ----, 2007 WL 2471805 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw

# EXHIBIT E

7 Misc.3d 1008(A)                                                                                   **Page 1**
7 Misc.3d 1008(A), 801 N.Y.S.2d 231, 2005 WL 841012 (N.Y.Sup.), 2005 N.Y. Slip Op. 50507(U)
(Cite as: 7 Misc.3d 1008(A))
C

Certain Underwriters at Lloyd's, London v. William M. Mercer, Inc.

N.Y.Sup.,2005.

(The decision of the Court is referenced in a table in the New York Supplement.)

Supreme Court, New York County, New York.
**CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, et al., Plaintiffs,**
**v.**
**WILLIAM M. MERCER, INC., Mercer Human Resource Consulting, Inc., f/k/a William M. Mercer, Inc., William M. Mercer Investment Consulting, Inc., f/k/a William M. Mercer, Inc., Mercer Risk Finance and Insurance Consulting, Inc., f/k/a William M. Mercer, Inc. William M. Mercer Companies, Inc., Risk Consultants & Actuaries, Ltd ., Risk Consultants & Actuaries, L.L.C., and Haytham Elzayn, Defendants.**
**No. 604515/02.**

April 12, 2005.

HERMAN CAHN, J.
*1 This decision concerns the claim that a "skimpy" complaint did not give the adversary and the court notice of a transactions to be proved, CPLR 3013. Therefore, it did not toll the statute of limitations as to claims asserted in a later amended complaint, causing those claims to be dismissed as time barred.

Defendant William M. Mercer, Inc. and various other Mercer entities (collectively, Mercer) move for summary judgment dismissing the amended complaint on the ground that all the causes of action are barred by a three-year statute of limitations, CPLR 3212. Mercer argues that it sold the plaintiffs' extended warranty consulting work to Risk Consultants & Actuaries, Ltd. (RC & A) on July 1, 1997, and thereafter provided no further services to the plaintiffs. Even taking into account a tolling agreement the parties entered into, Mercer argues that the claims were barred by the statute of limitations shortly before the plaintiffs filed the amended complaint on April 29, 2003.

FACTUAL ALLEGATIONS

The plaintiffs are underwriters at Lloyd's, London, UnionAmerica Insurance Company, Ltd., and Zurich Re (UK) Ltd. (collectively, the Underwriters). The Underwriters insured or reinsured certain extended warranty programs for automobiles, computers, and other goods, in the United States and Canada. They commenced this action against Mercer, RC & A, and RC & A's principal, Haytham ElZayn, to recover damages allegedly caused by errors and misconduct with respect to actuarial, consulting and other services the defendants provided to the Underwriters in connection with those programs. The RC & A defendants were dismissed from this action for lack of personal jurisdiction by decision and order dated September 22, 2004.

The Factual Background:

Extended warranty contracts are marketed to consumers when they purchase a product such as an automobile. The contracts are usually generated and administered by a third party administrator, but marketed by the retailers of consumer goods. The administrators typically purchase insurance to cover extended warranty claims and losses, thus insuring performance of their claim obligations, which may extend anywhere up to seven to ten years into the future.

The insurers may, in turn, purchase reinsurance. The risks (insurance) are usually placed by a licensed Lloyd's, London broker. The broker will either obtain several underwriters willing to underwrite 100% of the risk or will attempt to organize a "facility" that will allow the broker to place the risk with a single underwriter, (the lead underwriter), with the understanding that other participants, (the following market), will also accept the risk on the same terms. In general, the insurance or reinsurance of these programs by underwriters would be agreed to in blocks of time, typically one year, which would be referred to as a "year of account" or "treaty year" in the programs insured.

The Lloyd's broker engaged by the applicants in connection with the extended warranty programs at issue herein was Byas Mosley & Co., Ltd. The various extended warranty programs were insured or reinsured by the Underwriters under a master facility organized by Byas Mosley from February 1994 through December 1997. They are referred to as Acceleration, MBPI, Aegis, HonorGuard, GE

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Canada, GE USA, NHIC, Aon Computers, BCS, Private Label, HonorGuard (Canada), Honda, Meridian and Orion 2000.

**\*2** The amended complaint alleges that the success and profitability of extended warranty programs is dependent, in large part, upon establishing rates that are sufficient to cover the costs and losses over the term of the underlying contract (which may be as long as ten years) plus a reasonable profit. The principal term used to estimate the performance of these programs is ULR, which stands for Ultimate Loss Ratio. It is the ratio of the "ultimate losses" (claims payments plus loss adjustment expenses over the life of a program) to premium income. A ULR of 100% means losses are equal to premiums, although "breakeven" in such a program typically occurs at a ULR somewhat above 100% since much of the premium income is invested, sometimes for as long as seven years. Thus, a ULR of up to 105% would be profitable, whereas a ULR of 120% or 130% would be unprofitable.

Mercer-ElZayn Work on the Programs:

Having known and worked with defendant Haytham ElZayn since 1991, Byas Mosley contacted him at Mercer and engaged him in December 1994 to assess a prior actuary's work on three years of the Aegis program. ElZayn was a principal of Mercer, and the head of its Performance Assurance Consulting (PAC) division located in Columbus, Ohio. ElZayn prepared a report for the Underwriters in early 1995, showing that the prior actuary's ULR projections of approximately 80-85% were overly optimistic, and were approximately 40% too low.

As a result of ElZayn's work, Mercer was appointed "Book Actuarial Consultant" in April 1995. The engagement letter, authored by ElZayn, is dated April 10, 1995. It provides that Mercer would "do [its] best to protect the *integrity* of the book by providing the underwriters with the best possible advice (emphasis in original)." Cleary 11/19/04 Aff., Exh. 1. More specifically, the engagement letter sets forth that Mercer's assignment would be three-fold: (I) assist the Underwriters in the day-to-day review of plans, rates, state filings, loss ratio estimates and various other aspects as deemed necessary by the Underwriters; (ii) prepare quarterly reviews for each account, including ULR estimates for the life of each account year (seven years for

each account year); and (iii) produce an annual review for the run-off business of all prior books where Mercer was not the named consultant. The engagement letter concludes by recognizing that the Underwriters were desirous of "an independent Actuarial Consultant to protect the market's interests," and assured Byas Mosley that Mercer would "do [its] best to represent the interest of the market and to accurately report on the status of each of the books of business underwritten by the market." *Id.* The letter proposes that Mercer's fees would be $2 per contract during the year of account, 50% of the fees per account year (excluding the run-off books), and that Mercer would perform an annual review on the run-off books at a discounted rate to preserve the integrity of the analysis. The letter was "scratched," i.e., it was accepted by initialing, by Colin Baker, the Lead Underwriter, the next day.

**\*3** Thereafter, the work that Mercer's PAC division performed for the Underwriters was expanded. For the 1996 account year, Mercer was appointed as the Underwriters' consultant on additional accounts. By letter dated July 2, 1996, ElZayn, on behalf of Mercer, offered to provide significant additional services, asserting that, by doing so, Mercer would provide the Underwriters with accurate and reliable advice as they made decisions as to whether to enter into additional extended warranty programs or to renew existing ones. Specifically, Mercer agreed to provide the following services without any additional fees:
Verifying the timeliness and implementation of new rates.
Verifying the implementation of new procedures requested by the Underwriters.
Ensuring the adherence of various administrators to the underwriting guidelines set by the Underwriters.
Ensuring the quality of the data produced by the administrators.

Verifying the accuracy of the various reports that are sent to Underwriters on a regular basis.
Visiting the various administrators on a regular basis to verify implementation of various underwriters recommendations and to review the status of the administrator.
Verifying the accuracy of the premium remitted to London and the balances available in the reserve funds.
Verifying the accuracy of the lock box deposits and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7 Misc.3d 1008(A)                                                    **Page  3**
(Cite as: 7 Misc.3d 1008(A))

the accuracy of the distributions of the funds to the various parties involved.

Calculating the investment income due to Underwriters on the reserve funds.

Cleary 11/19/04 Aff., Exh. 2. ElZayn stated that although this list may not be complete, he saw Mercer's role as being beyond just generating actuarial reports.

### ElZayn's Leaving Mercer, and Taking Over the Underwriters' Account:

At some point in March 1996, ElZayn proposed that he leave Mercer and set up his own actuarial organization, taking the Byas Mosley business with him. According to the minutes of a meeting held on March 21, 1996, the Underwriters were reluctant to approve this as they preferred the comfort of Mercer's name on all work carried out. Nevertheless, ElZayn did leave Mercer in 1997. He formed RC & A on April 29, 1997. RC & A purchased Mercer's PAC division business pursuant to a written Asset Sale Agreement dated as of July 1, 1997.

Mercer contends that none of the actuarial services it is alleged to have provided the Underwriters occurred after July 1, 1997, but instead were provided by ElZayn's company, RC & A. Thus, the statute of limitations as to the claims against Mercer commenced to run on July 2, 1997.

In opposition to Mercer's summary judgment motion, Underwriters submit an affidavit from Jeremy Walker, who served as Assistant Underwriter and later Deputy Underwriter for the programs in question from 1994 to 1999. He contends that he first learned that ElZayn would be leaving Mercer and moving the Underwriters' work to a new company at or around the time of a Warranty Committee meeting on March 27, 1997, at which time there was discussion of having Mercer for the foreseeable future undertake peer review of ElZayn's work after he left. Later, in a Warranty Committee meeting on April 29, 1997, he was informed by Edward Rossdale of Byas Mosley that a senior Mercer executive, Henry Essert, had come to London to advise that Mercer would not be continuing with the extended warranty programs, but that there would a smooth transition of the business and staff to a new company to be started by

ElZayn. As indicated in the minutes of that meeting, Walker was advised that a prominent Mercer actuary, Stan Khury, would be Chairman of the new company and his wife, Irene K. Bass, who was a qualified actuary, would be a director. The Underwriters made no objection to proceeding in this fashion.

### ElZayn and RC & A Take Over the Underwriters' Account:

*4 About two months later, in early July 1997, the Underwriters received their first correspondence from ElZayn on the letterhead of RC & A, indicating that that would be his new business address effective July 1, 1997, and that he and Mercer had worked out an arrangement whereby London fee payments would be split for a period of time to facilitate cash flow for RC & A. Walker avers that he has since learned that a period of several months elapsed before Mercer, RC & A and ElZayn actually reached agreement as to the terms by which Underwriters' work would be transferred from Mercer to RC & A. He further claims that if the Underwriters had been made aware of this fact, they would have been concerned about the reliability of assurances Mercer had given of a smooth transition from Mercer to RC & A and would have taken appropriate steps to protect their interests.

### The Claimed Defects in Mercer's Work:

The Underwriters claim that, by late 1998, it started to become clear that the actuarial analyses and estimates provided by Mercer were dramatically incorrect on a program-wide basis. For example, the actual results of the Aegis Book V for the Underwriters reflect a ULR of 136%, not the 92.8% previously projected by Mercer, with total underwriting losses of $13 million. Another program, BCS I, has a nearly final ULR of 130%, not 87.6% or 85% as previously projected by Mercer, and underwriting losses of over $4 million.

The Underwriters allege that one reason why the actual program results and the initial actuarial projections are so far apart is that the work ElZayn assumed responsibility for far outstripped the skills and capabilities of the personnel devoted to them. They allege that although Mercer had identified itself as skilled in the provision of actuarial services, all of the work performed for the Underwriters was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7 Misc.3d 1008(A)
(Cite as: 7 Misc.3d 1008(A))

done by the PAC division headed up by ElZayn. When Mercer was appointed Book Actuarial Consultant in 1995, there were no qualified actuaries in the PAC group. Nine exams are required for associate status, and eleven for fellow status, in the Casualty and Actuarial Society (CAS). The Underwriters contend that ElZayn was not an actuary since he failed the fourth CAS examination twice and stopped pursuing accreditation in 1990. Kevin Habash, another employee, had a PhD in Economics, but no apparent actuarial accreditation, and Anita Wilson was also not an actuary. Stephen Marateas was the only actuary who worked for the PAC division from 1993 to 1997, and he was not hired by Mercer until August 1996, more than 15 months after Mercer was retained. ElZayn supervisor, Stan Khury, who was a qualified actuary, allegedly discovered this problem in August 1995, and suggested, in the words of the Underwriters, various "reforms" for the PAC division in a memorandum to file dated September 12, 1996. His changes included peer review "in the full sense of the word," and additional staffing, with some discussion of moving Chad Wischmeyer from Atlanta to PAC in Columbus. The Underwriters allege that Khury's reforms were never fully implemented, and that none of these developments were ever disclosed to the Underwriters, nor were they ever advised that the work product that they had received before this point had been generated without peer review by a qualified actuary.

*5 The Underwriters allege that a conflict of interest existed because the defendants were compensated on a volume basis. Mercer had a consistent bias in favor of more programs, easy renewals and higher volumes of premium income and newly-sold extended warranty contracts. Although the Underwriters were aware that volume-based compensation could provide an incentive to the defendants to make actuarial and other professional judgments by "voting with their pocket book" (Amended Complaint ¶ 86), they claim that they were assured that this would never happen and that the clients' interests were always paramount.

The Underwriters allege that serious acts and omissions were committed by Mercer with respect to the BCS program. In late 1995, the Underwriters were presented with a proposed extended warranty program insured by BCS Insurance Company (BCS), and administered by Insurance Specialists Inc. (ISI).

BCS and ISI sought to reinsure this business in the London market. Mercer was retained to evaluate the program and to provide a report to the Underwriters. Its final report dated December 26, 1995, which was allegedly improperly influenced by Byas Mosley and the U.S. broker for BCS, recommended a "positive consideration" by the Underwriters subject to a full rating review by March 31, 1996.

The changes in Mercer's report and the role played by these others were allegedly concealed from the Underwriters until 2000. Also concealed was the role that ElZayn allegedly played in concealing and minimizing a far more negative assessment of the program by a bona fide actuary at Mercer, Chad Wischmeyer.

In reliance on Mercer's enthusiastic report, and without any awareness of the far more negative Wischmeyer report, the Underwriters covered the program on December 28, 1995. They also contend that, in 1996, Mercer was informed that certain critical rate implementation information, relied upon in Mercer's report of December 26, 1995, was incorrect but failed to inform the Underwriters. Instead, Mercer secretly negotiated rate and program changes with ISI and BCS without the input, approval or knowledge of the Underwriters.

The Underwriters' claims are based on: (1) negligence; (2) professional negligence; (3) breach of contract; (4) fraud; (5) negligent misrepresentation; and (6) breach of fiduciary duty. The amended complaint seeks only money damages.

### DISCUSSION

The Tolling Agreements:

On February 28, 2000, the Underwriters and Mercer entered into a 90-day tolling agreement regarding the Underwriters' potential claims against Mercer related to the extended warranty programs. The tolling agreement was extended many times at the request of the Underwriters, but ultimately expired on December 16, 2002, for a total period of two years, nine months, and 16 days, or 1,022 days FN1

FN1. There were 29 days in February of 2000.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7 Misc.3d 1008(A)
(Cite as: 7 Misc.3d 1008(A))

The Underwriters commenced this lawsuit on December 16, 2002 by filing a summons and complaint. The original six-paragraph complaint sought unspecified monetary damages from Mercer for:
*6 breach of contract, promissory estoppel, fraud, misrepresentation, professional negligence and breach of fiduciary duty arising out of the business dealings among and between [the parties] for, among other things, the factual and legal reasons already supplied to counsel for William M. Mercer by letter dated December 6, 2002, such letter being incorporated by reference herein.

Complaint ¶ 6. The December 6, 2002 letter is not attached as an exhibit to the original complaint.

Mercer moved to dismiss the complaint for failure to state a claim, CPLR 3211(a)(7), or for a more definite statement, CPLR 3024(a). The Underwriters elected not to oppose the motion, but rather filed an amended complaint on April 29, 2003 pursuant to CPLR 3025(a).

The Statute of Limitations:

Mercer argues that the statute of limitations was not tolled until April 29, 2003, when the Underwriters filed the amended complaint, because the original six-paragraph complaint filed on December 16, 2002 failed to give notice of the transactions and occurrences constituting the claims against Mercer. It argues that by filing the amended complaint on April 29, 2003 in lieu of responding to the motion to dismiss, Underwriters effectively conceded that the original complaint was deficient under CPLR 3013, and therefore the amended complaint does not relate back to the original complaint for statute of limitations purposes.

Underwriters contend that the original complaint tolls the statute of limitations, and that the amended complaint merely amplified each of Underwriters' causes of action. They argue further that the detailed allegations in their counsel's eight-page December 6, 2002 demand letter, which was incorporated by reference into the complaint, should be considered part of that pleading for determining whether the original complaint provides sufficient notice of the transactions and occurrences upon which the amended complaint is based.

In this court, a claim is usually interposed when the action is commenced. CPLR 203(c). Commencement occurs upon the filing of the summons and complaint or the summons with notice. CPLR 304.

The relation back doctrine, embodied in CPLR 203(f), provides:
A claim asserted in an amended pleading is deemed to have been interposed at the time the claims in the original pleading were interposed, *unless the original pleading does not give notice of the transactions, occurrences, or series of transactions or occurrences, to be proved pursuant to the amended pleading.* (Underlining added)

The December 6, 2002 Demand Letter:

The first issue is whether the December 6th letter can be deemed part of the original pleading for purposes of the statute. If it is, its contents can be considered in determining whether the original complaint gave sufficient notice to satisfy CPLR 203(f); if it is not, it will, of course, be disregarded for this purpose.

New York law is clear that no document will be considered part of a pleading unless it is attached to the pleading or fully quoted in the pleading. CPLR 3014 states, in pertinent part, that "[a] copy of any writing which is attached to a pleading is a part thereof for all purposes." "[A] contract or writing referred to in a pleading but not set forth in full or attached to the pleading is no part of the pleading and may not be considered in passing upon the sufficiency thereof." *Anderson v. N.Y. Central Railroad Co.*, 284 App.Div. 64, 66 (4th Dept 1954) , citing *DuPont Automobile Distributors, Inc. v. DuPont, Motors Inc.*, 213 App.Div. 313, 315 (1st Dept 1925), and *Boiardi v. Manrden, Orth & Hastings Corp.*, 194 App.Div. 307, 310 (1st Dept 1920), *appeal dismissed* 230 N.Y. 607 (1921); *see also Bell Television, Inc. v. Cal-New Yorker, Inc.*, 26 Misc.2d 622 (Sup Ct, N.Y. County), *affd* 12 A.D.2d 591 (1st Dept 1960). Moreover, since CPLR 3013 requires that a pleading must give notice of the claims to both the parties and the court, a document admittedly in the parties' possession, but not attached to or quoted in full in the complaint, would not give proper notice to the defendant or to the court. The Underwriters' reliance on federal cases construing FRCP 10(c) is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

misplaced. Thus, the December 6, 2002 letter can not be considered part of the complaint, since it was not annexed to, or quoted in, the complaint.

**\*7** New York law is equally clear that the original pleading itself must give the notice required by CPLR 203(f), and that notice from other sources is insufficient. In *Shapiro v. Schoninger* (122 A.D.2d 38 [2d Dept 1986] ), the plaintiffs had actual notice of the gravamen of counterclaims in an amended answer from other legal proceedings and actions brought against them by the defendant. The Second Department held that the counterclaims were untimely and did not relate back to the original answer, ruling that "the pleadings themselves must give the requisite notice" *Id.* at 39-40; *see also Coleman, Grasso and Zasada Appraisals, Inc. v. Coleman,* 246 A.D.2d 893, 894 (3rd Dept), *lv dismissed* 91 N.Y.2d 1002 (1998); *Maxon v. Franklin Traffic Service, Inc.,* 261 A.D.2d 830, 830-31 (4th Dept 1999).

### The Requirements of CPLR 3013:

Thus, the issue is whether the original complaint itself gives adequate notice of the transactions and occurrences forming the basis of the six causes of action alleged in the amended complaint. While it is true that the original complaint does list these causes of action in a conclusory manner, there can be no doubt that this pleading is legally deficient under CPLR 3013. That statute requires that a pleading be "sufficiently particular to give the court and parties notice of the transactions, occurrences, or series of transaction or occurrences, intended to be proved and the material elements of each cause of action or defense." While CPLR 3013 was intended to be less exacting than its earlier counterpart, it is still necessary "that the pleading enable the defendant to determine the nature of the plaintiff's grievances and the relief he seeks in consequence of the alleged wrongs." *Shapolsky v. Shapolsky,* 22 A.D.2d 91 (1st Dept 1964); *see also Willis v. Kepner,* 109 A.D.2d 950 (3d Dept 1985)(complaint which alleges no facts, merely a list of legal theories, violated CPLR 3013). Merely pleading that a contract was breached, without setting forth the nature of the contractual obligation alleged to have been violated or the nature of the claimed breach violated CPLR 3013. *Sebro Packaging Corp. v. S.T.S. Industries, Inc.,* 93 A.D.2d 785 (1st Dept 1983).

In this case, the original complaint merely alleges that Mercer is being sued for breach of contract and the usual laundry list of business torts committed during 1994 through 1997 as a result of their "business dealings" in connection with "certain extended warranty and service contract programs." It fails to identify which extended warranty programs are at issue, what errors or omissions Mercer is accused of making, or how or why Mercer's breach of any contractual or legal duties damaged Underwriters. In essence, it merely announces to Mercer that it is being sued for unspecified conduct causing unspecified damages.

Underwriters argue that where an amended pleading is merely expanding or amplifying a cause of action already asserted, although defectively pleaded, the amendment can relate back. Two of the three cases they cite (*Ruggiero v. New York City Transit Authority,* 20 Misc.2d 535 [Sup Ct, Kings County 1959], and *Kaplan v. K. Ginsburg, Inc.,* 14 Misc.2d 356 [Sup Ct, N.Y. County 1968], *modified* 8 A.D.2d 726 [2d Dept 1959] ), rely on *Harriss v. Tams* (258 N.Y. 229 [1932] ). CPLR 203(f) was intended to overrule *Harriss* and related cases. *Jolly v. Russell,* 203 A.D.2d 527, 530-31 (2d Dept 1994) (Mangano, P.J., dissenting), citing Second Preliminary Report of Advisory Committee on Practice and Procedure, Article 5, at 51 (1958). The third case (*Scott v. Allen,* 41 N.Y.S.2d 241 [Sup Ct, Kings County], *affd* 267 App.Div. 766 [2d Dept 1943], *lv denied* 267 A.D.2d 827 [2d Dept 1944] ), pre-dates CPLR 203(f). In any event, it does not appear that the relation back doctrine has ever been applied where the defect in the original pleading is a total failure to plead any facts supporting the causes of action.

**\*8** Accordingly, the amended complaint does not relate back to the original complaint, and the statute of limitations continued to run between December 16, 2002 and April 29, 2003.

### Applying the Statute of Limitations:

The amended complaint asserts separate claims against Mercer for both negligence and professional negligence. The first cause of action alleges that Mercer "failed to exercise due care and skill in providing actuarial and consulting services to Underwriters." Amended Complaint ¶ 99. The second cause of action alleges that Mercer "violated

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

their professional obligations [as actuaries] and failed to discharge their professional obligations with the degree of skill and competence expected and required of actuaries." *Id.* ¶ 108.

Pursuant to CPLR 214(4), an "action to recover damages for an injury to property" is governed by a three-year statute of limitations. CPLR 214(6) provides that an action for professional malpractice, other than medical malpractice, must be commenced within three years, regardless of whether the underlying claim is based on contract or tort. However, actuaries are not professionals within the meaning of CPLR 214(6). *Castle Oil Corp. v. Thompson Pension Employee Plans, Inc.,* 299 A.D.2d 513, 514 (2d Dept 2002); *see also New York District Council of Carpenters Pension Fund v. Savasta,* 2005 WL 22872 *3 (SD N.Y.2005). Accordingly, claims arising from the negligence of non-medical professionals who do not fall within the ambit of CPLR 214(6) are governed by the limitation periods applicable to negligence actions, i.e., CPLR 214(4). *Chase Scientific Research, Inc. v. NIA Group, Inc.,* 96 N.Y.2d 20, 30-31 (2001); *Castle Oil,* 299 A.D.2d at 515, *supra.*

Mercer argues that the last possible date for any negligent acts committed by it was July 1, 1997, when the London business was sold to RC & A. Between that date and the date Mercer entered into the tolling agreement, February 28, 2000, two years and nearly eight months had passed. Adding the additional period of time between the filing of the original complaint and the amended complaint, four months and 13 days, a total of 3 years and 12 days ran before the statute of limitations was tolled. If the court were to consider the date of the last allegation of misconduct by Mercer actually pleaded in the amended complaint, or which the Underwriters have disclosed in their interrogatory responses, the July 3, 1996 allegation of negligence with regard to the BCS program, more than four years elapsed before the Underwriters filed the amended complaint.

In opposition, the Underwriters' contend that July 1, 1997 refers only to an "effective date" of the sale agreed to by Mercer and RC & A, and that the actual sale took place months later. As support for this statement, they rely on a letter dated December 29, 1997 from counsel to ElZayn to counsel for Mercer's parent, which indicates that the parties were still negotiating changes to the Asset Purchase

Agreement as of that date. Cleary Aff., Exh. 12. A fully executed agreement was not transmitted to ElZayn until February of 1998. *Id., Exh. 13. In addition, Jeremy Walker claims that, after receiving the July 2, 1997 letter from ElZayn, no immediate steps were taken to update the multiple placement slips and related programs that were in place in mid-1997, each of which named Mercer as the Underwriters' consultant. In some instances, an amendment to the slip was generated, but in most instances the change-over was documented at renewal with a new treaty year slip showing RC & A in lieu of Mercer. This change-over of the slips generally took place as annual renewals were processed in the twelve months following July 1, 1997.

*9 This evidence fails to raise a triable issue of fact as to whether Mercer actually provided any services to the Underwriters after July 1, 1997. The Asset Purchase Agreement may have been finally executed in late December 1997 or early 1998, but it clearly provides that its effective date is July 1, 1997. The Underwriters' own amended complaint, which details the services Mercer allegedly provided to Underwriters, at no point cites any services provided after July 1, 1997. To the contrary, on the GE USA program, the amended complaint alleges that RC & A was named as the consultant on July 1, 1997. Amended Complaint ¶ 55(f). The Underwriters' interrogatory responses also fail to identify any actuarial services provided by Mercer after July 1, 1997.

In a prior affidavit dated September 1, 2003, Jeremy Walker, the Underwriters' main representative in this litigation, acknowledges receiving correspondence from ElZayn on the letterhead of RC & A in early July 1997. The correspondence in question is a letter dated July 2, 1997 from ElZayn to Byas Mosley on RC & A letterhead. The letter explains the cash flow facilitation agreement entered into by Mercer and RC & A in connection with the sale of Mercer's PAC division to RC & A, and clearly states that RC & A would be the recipient of fees for work starting on July 1, 1997. Notably, Byas Mosley responded the next day with a letter addressed to ElZayn at RC & A, not Mercer. *See Bauer 12/3/04 Affirm., Exh. A. Mercer has presented other correspondence between RC & A and the Underwriters or their representatives after July 1, 1997 (*see Bauer 12/3/04 Affirm., Exh. B);

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 8

correspondence after July 1, 1997 between the Underwriters and third parties identifying RC & A as their consultant (*id.*, Exh. C); and the invoices from RC & A to the Underwriters for their work beginning in July 1997 (*id.*, Exh. E). Underwriters present no evidence whatsoever of services provided by Mercer to them after July 1, 1997.

Underwriters also claim that since they were not a party to the Asset Sale Agreement, Mercer maintained full responsibility under its contractual agreements with them to perform the promised actuarial and consulting services. Thus, Mercer remained vicariously liable for the acts and omissions of ElZayn and other PAC division employees. This argument fails for two reasons. First, the undisputed documentary and testimonial evidence is that, although the Underwriters did not consent to the sale in writing, as was originally contemplated by Mercer and RC & A (*see* Cleary 11/19/04 Aff., Exh. 11), Underwriters acquiesced to RC & A taking over Mercer's responsibilities. This acquiescence occurred without any questioning as to whether Stan Khury or his wife were part of the new company's management team, as the Underwriters now claim they were led to believe. Second, even if Underwriters had objected to the sale to RC & A, that would merely expose Mercer to liability for breach of contract, and does not impose vicarious liability on Mercer for allegedly negligent work performed by a separate legal entity.

*10 Underwriters also seek to avail themselves of the doctrine of equitable estoppel, arguing that the relevant limitations periods were tolled by Mercer's non-disclosures and fraudulent concealment. They contend that Mercer failed to disclose that its actuarial work and reports were not prepared by actuaries or peer reviewed, failed to disclose that Stan Khury discovered that to be the case, and failed to disclose the negative conclusions reached by Chad Wischmeyer of Mercer when ElZayn redrafted reports to only present a positive evaluation of the BCS program. As a result of these allegedly fraudulent concealments, Underwriters contend that Mercer should be equitably estopped from pleading the statute of limitations where its own fraudulent conduct dating back to 1995 prevented Underwriters from learning of Mercer's actions.

To establish an entitlement to equitable estoppel, a plaintiff must make a showing that it was induced by

fraud, misrepresentation, or deception to refrain from commencing a timely action. *Simcuski v. Saeli,* 44 N.Y.2d 442, 450 (1978); *Kaufman v. Cohen,* 307 A.D.2d 113, 122 (1st Dept 2003); *East Midtown Plaza Housing Co., Inc. v. City of New York,* 218 A.D.2d 628 (1st Dept 1995). New York law is clear that the fraud that predicates application of equitable estoppel to bar a statute of limitations defense to an untimely action must be a separate, later fraud distinct from the acts underlying the action itself. *Rizk v. Cohen,* 73 N.Y.2d 98, 105-06 (1989); *Kaufman v. Cohen,* 307 A.D.2d at 122, *supra.*

Here, the doctrine does not apply because Underwriters point to the same fraudulent conduct to establish both equitable estoppel and their substantive causes of action. These acts further do not appear to have lulled Underwriters into waiting until December 16, 2002 to commence this action, and until April 29, 2003, to file the amended complaint. Indeed, the amended complaint itself alleges that, by late 1998, it had started to become clear that the actuarial analyses and estimates provided by Mercer were dramatically incorrect. *See* Amended Complaint ¶ 60.

Accordingly, the first and second causes of action are dismissed as time-barred, since they could have accrued no later than July 1, 1997, and the claims were not interposed until April 29, 2003. Subtracting the period of time the parties' tolling agreement was in effect, the claims were filed at least 12 days late.

The Breach of Contract Claim:

The third cause of action alleges that Mercer entered into a contractual relationship with Underwriters to provide accurate, reliable and high quality actuarial and consulting services, and that it breached its contracts by failing to provide such services. *See* Amended Complaint ¶¶ 112-117. Mercer argues that Underwriters' breach of contract claim merely restates their malpractice claim, and should be dismissed as redundant, relying on *LaSalle National Bank v. Ernst & Young LLP* (285 A.D.2d 101 [1st Dept 2001] ), and *IMO Industries Inc. v. Anderson Kill & Olick, P.C .,* 267 A.D.2d 10 [1st Dept 1999] ), cases in which the First Department ruled that a cause of action for breach of contract against a professional firm, which did not rest upon a promise

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



of a particular result and only claimed a breach of general professional standards, was a redundant pleading of the plaintiff's malpractice claim.

*11 The cases in which the redundant pleading rule has been applied in New York have concerned "professional" malpractice. Here, as stated above, Underwriters' separate claim for professional negligence, i.e., malpractice (*Chase Scientific, supra* at 24), fails because actuaries are not deemed to be professionals. In 1996, the CPLR was specifically amended to provide that non-medical malpractice cases are governed by a three-year statute of limitations, "irrespective of whether the underlying theory is based in contract or tort." CPLR 214(6). This amendment was intended to specifically overrule prior case law allowing the maintenance of malpractice actions under a breach of contract theory within the six-year statute of limitations (*see, e.g., Santulli v. Englert, Reilly & McHugh, P.C.,* 78 N.Y.2d 700, 708 [1992]; *Sears, Roebuck & Co. v. Enco Assoc., Inc.,* 43 N.Y.2d 389, 394-95 [1977] ), and to reduce potential liability of insurers and corresponding malpractice premiums. *Matter of R.M. Kliment & Frances Halsband,* 3 NY3d 538, 541-42 (2004); *Chase Scientific,* 96 N.Y.2d at 27. No such special legislation has been enacted to protect non-professionals such as actuaries or insurance brokers from the longer statute of limitations applicable to contract claims. Thus, a litigant may plead contract and tort causes of action against an actuary premised upon the same culpable conduct, even though different time bars may apply. *Chase Scientific,* 96 N.Y.2d at 25; *New York District Council of Carpenters Pension Fund v. Savasta,* 2005 WL 22872 *4, supra.*

Furthermore, the third cause of action does not merely allege a breach of general professional standards for actuaries, but alleges breaches of express contractual promises by Mercer in the April 10, 1995 engagement letter. Underwriters further contend that Mercer failed to perform many of the services listed in the July 3, 1996 Account Management Services letter, such as, verifying the timeliness of the implementation of rates, insuring the quality of data, verifying the accuracy of reports to be sent to the Underwriters, visiting administrators on a regular basis and verifying the accuracy of premiums remitted to London. Mercer contends that this second letter was never

"scratched" by Underwriters, signifying the acceptance of ElZayn's proposal, and that Underwriters themselves view the letter as an attempt by ElZayn to provide "get-well services." *See* Amended Complaint ¶ 77. However, the question of whether Mercer was contractually bound to provide the services outlined in the July 3, 1996 letter can not be resolved as a matter of law on these papers.

Accordingly, the six-year statute of limitations applicable to contract actions (CPLR 213[2] ), governs the third cause of action. Breach of contract claims accrue at the time of breach (*Ely-Cruikshank Co., Inc. v. Bank of Montreal,* 81 N.Y.2d 399, 402 [1993]; *R.V.R. Realty LLC v. Tenants Alliance,* 305 A.D.2d 289, 290 (1st Dept 2003). The parties agree that Mercer was initially retained to provide actuarial and consulting services on April 10, 1995. Even assuming that breaches occurred immediately, since the breach of contract claim was interposed on April 29, 2003, which is eight years and 19 days after April 10, 1995, the claim is timely when the 2-year, 9-month and 16-day tolling period is subtracted.

The Fourth and Fifth Causes of Action:

*12 The fourth and fifth causes of action allege that Mercer intentionally and/or negligently misrepresented and failed to disclose information to Underwriters that would have materially impacted their decisions to incept, renew, continue or alter coverage of the extended warranty programs, and that the Underwriters reasonably relied on these misrepresentations and non-disclosures to their detriment. Amended Complaint ¶¶ 119-120. Mercer contends that these claims are governed by the three-year statute of limitations applicable to the negligence claim, because these fraud and constructive fraud claims are incidental to that claim.

Causes of action for fraud must be brought within the longer of six years of the commission of the claimed fraud, or two years of discovery of the facts supporting a cause of action (CPLR 203[g], 213[8]; *Klein v. Arbor National Mortgage, Inc.,* 248 A.D.2d 240 [1st Dept], *lv denied* 92 N.Y.2d 805 [1998]; *Rostuca Holdings, Ltd. v. Polo,* 231 A.D.2d 402, 403 [1st Dept 1996] ). A cause of action for negligent misrepresentation or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7 Misc.3d 1008(A)
(Cite as: 7 Misc.3d 1008(A))

constructive fraud is also governed by a six-year statute of limitations, although the two-year discovery rule does not apply. *Avalon LLC v. Coronet Properties,* 306 A.D.2d 62, 62-63 (1st Dept 2003); *Schoen v. Martin,* 187 A.D.2d 253, 254 (1st Dept 1992).

However, " 'courts will not apply the fraud Statute of Limitations if the fraud allegation is only incidental to the claim asserted; otherwise, fraud would be used as a means to litigate stale claims.' " *Kaufman v. Cohen,* 307 A.D.2d at 119, quoting *Powers Mercantile Corp. v. Maurice Feinberg,* 109 A.D.2d 117, 120 (1st Dept 1985). In other words, where the alleged fraud is merely "the means of accomplishing the breach" of some other duty, whether imposed by contract or law, and adds nothing to the causes of action, the statute of limitations applicable to fraud claims will not control. *Powers Mercantile, supra* at 120; *Iandoli v. Asiatic Petroleum Corp.,* 57 A.D.2d 815, 816 (1st Dept), *lv dismissed* 42 N.Y.2d 1011 (1977).

The misrepresentations claims are based on allegations that Mercer's PAC division did not initially include any CAS fellows or associates, that Mercer failed to disclose the existence of this fact to Underwriters even after it was discovered; that Mercer made selective and misleading uses of a report prepared by a Mercer actuary Chad Wischmeyer on the BCS program FN2; that another Wischmeyer report critical of the Honorguard program was withheld from Underwriters; that ElZayn used incorrect data in December 1995 and then attempted to cover up his mistakes by concealing the conduct of program participants, some of which Mercer was also seeking to do business with, directly contrary to its representation to act as an independent actuarial consultant.

FN2. Underwriters have failed to raise a triable issue of fact regarding their claim that Mercer concealed the December 1995 Wischmeyer report from them. The undisputed evidence shows that ElZayn faxed the report to Edward Rossdale of Byas Mosley on December 21, 1995 with a handwritten note stating that he did not agree with all the conclusions of the report. *See* Bauer 12/3/04 Aff., Exh. K; *id.,* Exh. M: April 16, 2002 CE Test. of Colin Baker at pp. 304-305. Further, the testimony elicited from Underwriters' representative, Colin Baker, is that ElZayn was instructed to communicate

with Byas Mosley. *Id.,* Exh. M: April 16, 2002 C.E. Test. of Colin Baker at 305.

Underwriters' fraud claims do nothing more than add conclusory allegations of scienter to the same allegations underlying the negligence and breach of contract theories. In addition, Underwriters do not present any evidence to show that they have suffered any injury resulting from Mercer's alleged actual or constructive fraud that is different from the injury resulting from its claimed negligence or breach of contract.

*13 Accordingly, the fourth and fifth causes of action based on fraud and constructive are governed by a three-year statute of limitations, and are time-barred.

### The Breach of Fiduciary Claim:

The statute of limitations for a breach of fiduciary duty is either three or six years, depending on the substantive remedy sought (*Kaufman v. Cohen,* 307 A.D.2d 113, 118 [1st Dept 2003]; *Yatter v. William Morris Agency, Inc.,* 256 A.D.2d 260, 261 [1st Dept 1998] ). Where suits alleging a breach of fiduciary duty seek only money damages, courts have viewed such actions as alleging "injury to property," to which a three-year statute of limitations applies. CPLR 214(4); *Kaufman,* 307 A.D.2d at 118; *Yatter,* 256 A.D.2d at 261. Breach of fiduciary duty claims, like breach of contract claims, generally accrue upon the alleged breach. *Kaufman,* 307 A.D.2d at 121, n 3. Since the only relief sought by Underwriters is money damages, a three-year statute of limitations bars this claim.

### CONCLUSION AND ORDER

For the foregoing reasons, it is

ORDERED that Mercer's motion for summary judgment is granted to extent of dismissing the first, second, fourth, fifth, and sixth causes of action as time-barred, and is denied with respect to the third cause of action based on breach of contract.

N.Y.Sup.,2005.
Certain Underwriters at Lloyd's, London v. William M. Mercer, Inc.
7 Misc.3d 1008(A), 801 N.Y.S.2d 231, 2005 WL 841012 (N.Y.Sup.), 2005 N.Y. Slip Op. 50507(U)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



7 Misc.3d 1008(A)
(Cite as: 7 Misc.3d 1008(A))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F

152 F.3d 918
152 F.3d 918, 1998 WL 385835 (C.A.2 (N.Y.))
**(Cite as: 152 F.3d 918)**

▷

Individual Securities, Ltd. v. Ross
C.A.2 (N.Y.),1998.
NOTICE:    THIS IS AN UNPUBLISHED
OPINION.(The Court's decision is referenced in a
"Table of Decisions Without Reported Opinions"
appearing in the Federal Reporter. Use FI CTA2 s
0.23 for rules regarding the citation of unpublished
opinions.)
United States Court of Appeals, Second Circuit.
**INDIVIDUAL SECURITIES, LTD., et al.,**
**Plaintiffs-Appellants,**
**v.**
**Mark ROSS, Sr., et al., Defendants-Appellees.**
**No. 97-7953.**

May 11, 1998.

Appeal from the United States District Court for the
Southern District of New York.

Carl Lanzisera, pro se, Huntington Station, New
York.
Leon B. Lipkin, Esq., New York, for Appellees.

Present: WALKER, Jr. and JACOBS, C.J. and
AMON, D.J.FN*

FN* The Honorable Carol Bagley Amon, of the
United States District Court for the Eastern District
of New York, sitting by designation.

SUMMARY ORDER

*1 This cause came on to be heard on the transcript
of record from the United States District Court for
the Southern District of New York (Kaplan, J.), and
was argued.

ON CONSIDERATION WHEREOF, IT IS
HEREBY ORDERED, ADJUDGED AND
DECREED that the judgment of said district court
be and it hereby is affirmed.

Plaintiffs-appellants Carl Lanzisera ("Lanzisera")
and Individual Securities, Ltd. ("ISL"), a securities
brokerage firm, appeal from the June 16, 1997
judgment of the district court dismissing as time-
barred plaintiffs' complaint alleging state contract,
fraud, and breach of fiduciary duty claims. See
Individual Securities, Ltd. v. Ross, No. 96-CV-8899

(S.D.N.Y. June 12, 1997).

Initially, ISL's appeal must be dismissed because a
corporation cannot proceed pro se. See, e.g.,
Shapiro, Bernstein & Co. v. Continental Record
Co., 386 F.2d 426, 427 (2d Cir.1967) (per curiam).
This court has insisted that an attorney licensed to
practice law represent a corporation in court, id.,
and has prohibited corporations from assigning its
claims to a lay person in order to allow such an
individual to proceed pro se to prosecute its claims.
See Jones v. Niagara Frontier Transp. Auth., 722
F.2d 20, 23 (2d Cir.1983).

As to the statute of limitations issue, it is undisputed
that Lanzisera's cause of action against certain
defendants-appellees arose no later than February
24, 1989. Lanzisera signed a Uniform Submission
Agreement that submitted the matter to arbitration
on October 22, 1993. The National Association of
Securities Dealers' ("NASD") arbitration panel
dismissed the action without prejudice on May 22,
1995. Lanzisera requested rehearing on June 14, and
the NASD denied reconsideration on August 1,
1995. Lanzisera filed this action in the district court
for the Southern District of New York on November
25, 1996.

In this diversity action, we apply the forum state's
statute of limitations. See Iacobelli Constr., Inc. v.
County of Monroe, 32 F.3d 19, 27 (2d Cir.1994).
Recovery in a federal diversity action premised on a
state-created right is barred if the applicable state
statute of limitations has expired. See Guaranty
Trust Co. of New York v. York, 326 U.S. 99, 112,
65 S.Ct. 1464, 89 L.Ed. 2079 (1945). Under New
York law, Lanzisera was required to bring his
claims within six years after his cause of action
arose. See N.Y. C.P.L.R. § 213. Thus, barring
tolling, any complaint filed later than February 24,
1995 would be time-barred.

Lanzisera claims that the statute of limitations was
tolled while his matter was in arbitration. The
NASD's arbitration rules provide that:
[w]here permitted by applicable law, the time
limitations which would otherwise run or accrue for
the institution of legal proceedings shall be tolled
where a duly executed submission agreement is filed
by the Claimant(s). The tolling shall continue for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

such a period as the Association shall retain jurisdiction over the matter submitted.

*2 Brief for Appellant at 7-8, quoting NASD Manual at ¶ 3718. Under N.Y. C.P.L.R. § 204(b) ,[w]here it shall have been determined that a party is not obligated to submit a claim to arbitration, the time which elapsed between the demand for arbitration and the final determination that there is no obligation to arbitrate is not a part of the time within which an action upon such claim must be commenced. *The time within which the action must be commenced shall not be extended by this provision beyond one year after such final determination.*

(Emphasis added). This provision thus tolls the statute of limitations during the pendency of an arbitration that ends with a determination that there was no obligation to arbitrate. The tolling, however, does not extend the limitations period for more than one year after that determination has been made.

On May 22, 1995, the NASD panel "determined to dismiss this matter without prejudice and ... refer the parties to the remedies provided by applicable law. Further the panel rules that arbitration is not the proper forum for this matter." Appendix for Appellant at Tab 5. Rehearing of this matter was denied on August 1, 1995. Because arbitration was not the proper forum, CPLR § 204(b) applies. Because Lanzisera did not file his action until November 1996-more than one year after the NASD's final determination that arbitration was inappropriate-CPLR § 204(b) does not save Lanzisera's action from being time-barred.

CPLR § 204(b), moreover, is in harmony with the NASD rule that "[w]here permitted by applicable law," the statute of limitations is tolled during a pending NASD arbitration for the period during which the NASD "retain[s] jurisdiction over the matter submitted." CPLR § 204(b) simply does not extend the tolling of the limitations period *beyond* one year after the NASD's determination that arbitration is not warranted.

We have carefully considered plaintiffs' remaining arguments and consider them to be without merit. Accordingly, the judgment of the district court is hereby affirmed.

C.A.2 (N.Y.),1998.
Individual Securities, Ltd. v. Ross
152 F.3d 918, 1998 WL 385835 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.