**NASD DISPUTE RESOLUTION, INC.**

------------------------------------------------------------

In the Matter of the Arbitration Between　　　　:

GERARD MURO,　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　Claimant,　　　　　:

　　-- against --　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　:
UBS FINANCIAL SERVICES, INC., f/k/a　　　　　　:
UBS PAINEWEBBER, INC. and　　　　　　　　　　　:　　**Case Number 06-00612**
PAINEWEBBER, INC., and　　　　　　　　　　　　　:
MERRILL LYNCH, PIERCE, FENNER &　　　　　　　　:
SMITH, INCORPORATED; and　　　　　　　　　　　　:
SCOTT MATTHEW GRENERT,　　　　　　　　　　　　　:
　　　　　　　　　　　　　　Respondents.　　　　:

------------------------------------------------------------

**JOINT ANSWER OF RESPONDENTS UBS FINANCIAL SERVICES, INC. AND SCOTT GRENERT TO THE STATEMENT OF CLAIM**

------------------------------------------------------------

Respondents UBS Financial Services, Inc. ("UBS"), formerly known as UBS PaineWebber, Inc. and Scott Matthew Grenert ("Respondents"), by and for their Joint Answer to the Statement of Claim of Gerard Muro, submit the following summary of their position.[1] Respondents submit this narrative response in the belief that it is more helpful to the Panel than a mere recitation of admissions and denials. To the extent that any allegation in the Statement of Claim is not specifically addressed in

---

[1] The undersigned counsel represents Respondent Scott Grenert in this action for the period of time that he was employed at UBS.

1

this pleading, it is, and should be deemed, denied. Respondents reserve the right to amend this answer, as necessary.

## PRELIMINARY STATEMENT

This is an action that calls out for dismissal both for its palpable lack of merit and for its extreme tardiness. In a Statement of Claim submitted six years after the events he complains of, Claimant Gerard Muro -- a millionaire CEO and advertising executive -- contrives a dramatic tale in which his Merrill Lynch accounts were purportedly frozen for months (before they transferred to UBS) while he stood by helplessly, prevented from selling his technology holdings and unable to buy less risky securities.

Mr. Muro's story is pure fabrication. First, his Merrill Lynch accounts were not frozen or "in limbo." He could buy and sell and he did. Second, Muro had no desire and made no attempt to sell his technology holdings. During the very time period Muro now claims that he could not make any trades, his account statements show him actively *buying large blocks of technology stocks and mutual funds* while selling off his more conservative stocks and funds. His March 2000 Merrill Lynch account statements -- showing multiple purchases of tech stocks and funds during the alleged "freeze" period -- graphically illustrate the falsity of his claim, and explain, perhaps, why Muro waited six years after the supposed "freeze" to bring this clearly time-barred action.

Muro further alleges unsuitable recommendations made at UBS but he fails to identify a single stock or transaction in the Statement of Claim and fails to attach a

2

single document or exhibit to support his claim. His investments at UBS were few in number (most of his purchases were made at Merrill) and were entirely consistent with his sole investment objective, which was growth. Any losses he suffered were purely a function of timing: the market's historic decline of 2000 through 2002 coincided with Muro's arrival at UBS.

## BACKGROUND

Claimant Gerard Muro was the CEO and owner of Micom Group, Inc., a New York advertising agency, earning hundreds of thousands of dollars a year. By his own admission, when he came to UBS in April 2000, he arrived there with years of prior investment background and experience.

<u>Muro Opens Accounts At Merrill Lynch With Respondent Grenert</u>

In or about early 1998 Mr. Muro opened securities accounts at Merrill Lynch, with Respondent Scott Grenert as his broker. Mr. Grenert was recommended to Muro by a mutual friend. Muro lived and worked in New York at the time, but he opened his Merrill Lynch account in the Boston, Massachusetts branch where Grenert worked.

Investing largely in highly regarded growth and technology stocks and mutual funds, Muro's accounts flourished with Grenert at Merrill Lynch, growing nearly six-fold in value, from $122,000 in June 1998 to $681,000 (including both appreciation and additional deposits) by late 1999. (Exhibit A)

### Grenert Moves to PaineWebber But Muro Remains with Merrill Lynch

In August 1999, Mr. Grenert left Merrill Lynch to take a position at PaineWebber, which is now known as UBS. When he left, Mr. Grenert tried to persuade Mr. Muro to transfer his account to PaineWebber but Muro decided not to transfer. However, Mr. Muro did leave Merrill's Boston branch and opened new accounts at a Long Island branch with a new Merrill broker, Douglas C. Horn. (*Exhibit B*)

It was not until about eight months later, in April 2000 that Mr. Muro (after much hemming and hawing) finally decided to transfer his accounts over to Mr. Grenert at PaineWebber.

### There Was No Months-Long Delay In Transferring Muro's Account

Muro claims that there was a months-long delay in transferring his accounts from Merrill Lynch to PaineWebber. He says this delay created a "state of limbo" during which Muro was "not able to trade or liquidate." (Statement of Claim ¶17) There was no unusual delay in transferring Muro's accounts from Merrill Lynch to PaineWebber. [2] The only "delay" was caused by months and months of Muro's own indecisiveness about what to do.

Nor was there any freeze on trading in Muro's Merrill accounts during the eight months (September 1999 to April 2000) that Douglas Horn was his broker at Merrill Lynch. Muro was able to trade and did trade actively throughout that period.

---

[2] UBS records show a transfer request was sent out from UBS on April 12, 2000, via the Automatic Customer Account Transfer ("ACAT") system. Merrill Lynch rejected that transfer on April 13, 2000 because Muro had provided UBS with the wrong account numbers. The request was resubmitted with the correct account numbers on or about April 20, 2000. By April 28, 2000, the accounts were fully transferred, other than certain Merrill Lynch mutual funs that were not permitted to transfer, and some shares of ARCO stock that were the subject of a pending merger.

## Muro Was Buying Technology Funds During The Time Period He Says He Wanted Less Technology

Muro now alleges he was deeply concerned about his overconcentration in the technology market in the spring of 2000. (Statement of Claim ¶10) But it is clear from his actions that Mr. Muro was not trying to divest his portfolio of technology holdings in that time period. In March 2000, while he was still at Merrill Lynch with his new broker Douglas Horn, Muro was actively *buying* technology, communications and growth stocks and mutual funds in all of his accounts, while selling off his more conservative investments at the same time.

As his Merrill Lynch March 2000 account statements show, on March 7, 2000, Muro purchased 100 shares of Alliance Technology Fund at a price of over $150 a share. (*Exhibit B*) In that same week he bought the Merrill Lynch Global Technology mutual fund, selling a non-tech mutual fund to make the purchase. (*Exhibit B*) In March 2000, he also purchased Ericsson, Globix, ADC Telecommunications, Convergys Corp. and Novellus Systems, all technology stocks. He sold Philip Morris, Roslyn Bancorp and Barnes and Noble, all non-technology stocks. (Exhibit B) He purchased other aggressive growth mutual funds and sold a more conservative index fund. All of these purchases and sales were transacted through Mr. Horn, not Mr. Grenert.

## Muro's Opens His UBS Accounts In April 2000

In April 2000, as the information provided on his signed new account forms at UBS (time-stamped April 12, 2000) demonstrate, Mr. Muro was the fully-employed chief executive officer of Micom Group, Inc., with a million dollar net worth and a

very high income, and with years of broad investment trading experience in stocks, bonds and options:

|  |  |  |
|---|---|---|
| Occupation | : | CEO |
| Net worth | : | $1 Million |
| Annual Income | : | $300,000 |
| Years Investing | : | 10 yrs. (stocks) |
|  |  | 10 yrs. (bonds) |
|  |  | 10 yrs. (futures) |
|  |  | 10 yrs. (options) |

(*Exhibit C*)

His sole stated investment objective, which he selected in writing for each of the three accounts he opened, was "Capital Appreciation." His risk profile for the three accounts was "Moderate," which is defined in his new account agreement as "seeks greater potential returns, willing to accept higher risks of principal." (*Exhibit D*)

Mr. Muro is now claiming that, in 1998, he had suffered a "recent disability" from a serious car accident. (Statement of Claim ¶ 10) But at no time did Mr. Muro mention any such accident or disability to Mr. Grenert, or show signs of any disability. At no time did he mention an imminent retirement, as he now claims. As indicated on his new account forms, he was still working full-time and earning $300,000 a year, as of the spring of 2000.

Muro Keeps His Merrill Lynch Largely Portfolio Intact at UBS

In April 2000, Muro transferred his Merrill Lynch portfolio to UBS. Muro's portfolio included growth and technology stocks and mutual funds, many of which he had purchased with Mr. Horn. Muro remained at UBS for only about sixteen

6

months, until August 2001. While he remained a client at UBS, he kept the majority of his Merrill Lynch holdings intact. There was little trading activity in his accounts. Nine of the seventeen investments that Muro brought over from Merrill in his main account remained in that account as of August 14, 2001-- the date on which he abruptly sold off all of his UBS holdings and essentially closed out his UBS accounts.[3]

Losses In Muro's Main Account

Muro's arrival at UBS in the spring of 2000 coincided almost exactly with the end (we now know only in hindsight) of the bull market of the 1990's. The ensuing bear market lasted over two years, constituting the most severe and prolonged market decline in over sixty years. Muro liquidated his UBS holdings in August 2001, right in the middle of that historic bear market. Thus, his investments at UBS suffered substantial losses, as did all growth investors. During his sixteen months at UBS his main account suffered a loss in value of approximately 40%, while the NASDAQ Index lost about 50% of its value during the same time frame.

---

[3] During the sixteen months Muro was at UBS, he purchased (in his largest and most active account) only seven new stocks: Motorola (100 shares), Amgen (350 shares), Chase Manhattan, (400 shares), Schering Plough (500 shares), Wells Fargo (500 shares), JDS Uniphase (400 shares), and RF Micro Devices (250 shares).

# LEGAL ARGUMENT

## I. THERE IS NO FACTUAL BASIS FOR MR. MURO'S PRIMARY CLAIM THAT HIS ACCOUNTS AT MERRILL LYNCH WERE FROZEN

Muro's primary claim in this arbitration is that there was a months-long delay in transferring his accounts to UBS from Merrill Lynch, and that this lengthy delay caused his accounts to be frozen. He says that during these months, he was told "no trading was possible." (Statement of Claim ¶ 14.)

As set forth above, none of these allegations is true. Mr. Muro opened his accounts at UBS on or about April 12, 2000. His accounts were transferred over from Merrill Lynch to UBS by April 28, 2000. There was no lengthy time period during which Mr. Muro was prevented from transacting purchases and sales in his Merrill Lynch accounts. The claim of delay (as against UBS) makes no sense because UBS and Scott Grenert would have had no reason and no motive to delay the prompt transfer of a new account.

Contradicting his claim that he was told in March that "no trading was possible" (Statement of Claim ¶14), Muro's Merrill account statements for March 2000 show substantial trading activity, as documented above. (*Exhibit B*)

Thus, Muro's central claim -- that he lost money due to an inability to effect transactions in his account -- is demonstrably false and is directly contradicted by his own account statements.

## II. MURO'S PURCHASES OF TECHNOLOGY STOCKS AND FUNDS IN MARCH 2000 DEFEAT HIS CLAIM THAT HE WAS PREVENTED FROM SELLING HIS TECH HOLDINGS

Muro further claims that, because of the alleged freeze in his account, he was prevented from selling off his technology holdings, as he now claims he desired to do, causing catastrophic losses.

This is a total fabrication. Muro displayed no intention of selling his technology holdings, as evidenced by the fact that he was actively buying technology and aggressive growth mutual funds and stocks in the spring of 2000. He bought Alliance Technology Fund, Merrill Lynch Tech Fund, Ericcson, Globix and ADC Telecom, among others. All of these transactions were effected at Merrill Lynch, with Mr. Horn. Mr. Grenert and UBS had nothing to do with any of them. The Panel must ask: are those the kind of investments one would expect of an investor who "was extremely concerned" about impending retirement and about reducing risk?

During the very same time frame, Mr. Muro (through Mr. Horn) was selling off his bank stocks (Roslyn Bancorp was sold March 9, 2000, his retail stocks (barnesandnoble.com, sold March 9, 2000) and his most conservative mutual funds (Merrill Lynch S&P 500 Index Fund, sold March 13, 2000), Putnam Investors Fund, sold March 7, 2000). Is that the strategy one would expect of an investor who felt he was overconcentrated in technology and "insufficiently diversified"?

Also during this time period, Mr. Muro held onto and decided not to sell his Cisco, Lucent, Ask Jeeves, ML Global Tech Fund, ML Global Growth Fund, EMC Corp., Intel and Microsoft. Are these decisions to hold technology stocks consistent with an investor who is intent on reducing his technology concentration?

Mr. Muro's actions speak far louder than his words and they tell a very different story. They tell this Panel that it was not a delay in transferring his accounts that caused Muro's alleged losses, but rather his own aggressive investment decisions, for which he now seeks to abdicate all responsibility.

### III. MURO'S INVESTMENTS WERE SUITABLE AND APPROPRIATE FOR HIS INVESTMENT PROFILE

Muro alleges that Scott Grenert recommended unsuitable, high-risk technology securities for his accounts at UBS. Significantly, not a single "unsuitable" security is identified in the Statement of Claim.

As the account statements make clear, virtually all of the securities that Muro owned were purchased at Merrill Lynch. They were not purchased or recommended at UBS. Absent a recommendation or a purchase, there can be no claim of unsuitability.

The statements show that Muro bought only seven new stocks in his main account during his entire sixteen months at UBS, and at least four of the seven (Wells Fargo, Chase, Amgen and Schering Plough) were not "technology" stocks. Certainly, Muro is not alleging that Wells Fargo or Chase or Schering Plough is an unsuitable technology stock. Yet each of these non-technology stocks suffered losses in 2000 and 2001, not because they were unsuitable or overly risky but because, as we now know with hindsight, the stock market in those two years suffered its broadest and most protracted decline in over sixty years, causing losses for virtually every growth stock.

Each of the few recommendations made by Grenert at UBS was consistent with Muro's expressed goals and objectives. Each matched the growth orientation indicated on his new account form. The historic market decline of 2000 and 2001 was the sole cause of any alleged losses -- not the alleged unsuitability of the stocks he purchased.

### IV. MURO'S "LOSSES" ARE LARGELY ILLUSORY

Muro appears to be claiming losses in his UBS accounts of $318,308. (Statement of Claim ¶ 30) While Muro's accounts were still at Merrill Lynch, he had realized significant profits in such technology stocks as Cisco, Intel, Nortel and Lucent. He then transferred these holdings to UBS, after they had already soared in value.

Some of Muro's profits in these stocks were offset by losses in the years 2000 and 2001 at UBS, as the market declined. Now, Muro is seeking to recover those "losses" without accounting for the prior gains in the same stock positions that offset (in some cases entirely) his claimed losses. Such illusory "losses" are not compensable.

Muro also seeks to recover his losses on stocks that were recommended and sold by Doug Horn at Merrill Lynch. Plainly, he is not entitled to claim these as damages against UBS.

### V. ALL OF MURO'S CLAIMS ARE TIME-BARRED

When an investor sits idly for six years before filing claims in arbitration, it is inevitably a sign that the underlying claims are hollow and lacking in merit.

11

This arbitration was filed in February 2006. Most of Muro's relevant technology purchases (though not identified) occurred in 1999 and early 2000. As such, they are not eligible for arbitration under NASD Code of Arbitration Procedure 10304, which requires that an action be brought within six years of the transaction. Muro's claims are further time-barred under applicable federal and state statutes of limitation. Muro alleges unsuitability (Count II). Claims of unsuitability are a subset of federal securities fraud claims and are governed by the federal statute of limitations for bringing such claims. *See Cigna v. Dodds*, 12 F. ed 346, 351-52 (2d Cir. 1993). For Muro's transactions, the applicable federal statute of limitations is the familiar one year/three year rule enunciated by the United States Supreme Court in *Lampf, Pleva. Lipkind, Prupis & Petigrow v. Gilberston*, 115 L.Ed 321, 111 S. Ct 2773 (1991). Under this time restriction, securities claims must be brought within one year of the discovery of facts constituting the violation and, in no event, more than three years following the transaction itself.

Obviously, Mr. Muro has missed both the one year and three year deadlines by a very wide margin. He left UBS in August 2001 so, perforce, there could not have been any transactions in his accounts after that date. Thus, by August 2004, the three-year statute of limitations had unquestionably elapsed.

Muro's claims of breach of fiduciary duty and failure to supervise (Counts 4 and 5) are likewise time-barred, by New York's three-year limitation period on such claims.

## VI. MURO PAID "PREFERENTIAL COMMISSIONS," NOT FULL COMMISSIONS

Muro tosses into his Statement of Claim the puzzling allegation that "despite Grenert's promise to limit commissions, UBS failed to do so and instead charged full commissions." (Statement of Claim ¶ 18) Confirmations for all purchases made at UBS indicate that Muro was charged "preferential" commissions on every transaction. (*Exhibit E*) A "preferential" commission is a discounted commission, which means "less than the full rate." Like all of Muro's claims, this one too is made up out of thin air.

## CONCLUSION

Muro was a sophisticated investor who rode the market up, never once complaining about the suitability of his investments. He gave back some of his gains in the bear market and now, many years later, has concocted a story about delayed transfers and a frozen account. There is no truth to his story nor any basis to his claims, and they should be dismissed.

13

## AFFIRMATIVE DEFENSES

### First Defense

The Statement of Claim fails to state a claim upon which relief may be granted.

### Second Defense

Claimant's causes of action are barred by the doctrines of ratification, waiver, and estoppel.

### Third Defense

Claimant cannot demonstrate that UBS Financial Services, Inc. acted with the requisite scienter. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1975).

### Fourth Defense

In light of Claimant's financial condition, investment objectives, risk profile, experience, portfolio composition and communications with UBS Financial Services, Inc., Respondent had "reasonable grounds" for believing that the securities recommendations and the PACE Account were suitable. (*See* NASD Rule of Practice 2310).

### Fifth Defense

Claimant expressly and implicitly represented to UBS Financial Services, Inc. that he understood and acknowledged the fees he would be paying.

### Sixth Defense

UBS Financial Services, Inc. was not the proximate cause of any injury to the Claimant.

### Seventh Defense

There is no independent cause of action for violation of NYSE or NASD rules. *See, e.g., Knight v. E.F. Hutton & Co., Inc.*, 750 F. Supp. 1109 (M.D. Fla.1990).

14

### Eighth Defense

The transactions complained of in the Statement of Claim were duly authorized by Claimant, or by his authorized agent or attorney in fact, by virtue of a valid power of attorney.

### Ninth Defense

UBS Financial Services, Inc. and its officers, agents and employees, in discharging their duties, acted in good faith and exercised the degree of care, diligence, and skill which a prudent person would exercise in similar circumstances and like positions.

### Tenth Defense

A brokerage firm satisfies its obligation to supervise its employees if (i) there are established procedures and a system for applying such procedures which "would reasonably be expected to prevent and detect" violations; and (ii) supervisory personnel have "reasonably discharged the duties and obligations incumbent upon him by reason of such procedures . . . ." *See* Section 17(a) of the Securities Act of 1933. The evidence will demonstrate that UBS Financial Services, Inc. properly supervised Claimant's accounts.

### Eleventh Defense

Claimant had the opportunity and means to mitigate damages to his account, but failed to do so in an appropriate and reasonable manner.

### Twelfth Defense

Claimant's alleged losses were not proximately caused by any alleged misconduct of UBS Financial Services, Inc.

### Thirteenth Defense

Punitive damages are not available under Section 10(b). *See, e.g., Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp.*, 801 F.2d 13, 29 (2d Cir. 1986), *cert. denied*, 479 U.S. 1066 (1987) ("actual damages" provision of Section 28(a) of the Securities Exchange Act of 1934 bars punitive damages under Section 10(b)); *Stone v. Kirk*, 8 F.3d 1079 (6th Cir. 1993).

### Fourteenth Defense

Claimant has failed to plead fraud with particularity.

### Fifteenth Defense

The claims are barred, in whole or part, by applicable statutes of limitation.

### Sixteenth Defense

Claimant is incompetent to bring the Claims, and/or lacks standing to bring the Claims.

WHEREFORE, Respondents UBS Financial Services, Inc. and Scott Matthew Grenert request dismissal of all claims against them in the Statement of Claim, an award in their favor of the costs and disbursements of this proceeding, and such other and further relief as is just and proper, including a recommendation of expungement for the individual Respondent. Respondents request a three-arbitrator panel to hear this matter.

Dated: Weehawken, New Jersey
       June 8, 2006

UBS FINANCIAL SERVICES, INC.
AND SCOTT MATTHEW GRENERT

By: Jon D. Kaplon
Director
Associate General Counsel
UBS Financial Services Inc.
1200 Harbor Boulevard
Weehawken, NJ 07086-6791
Tel: (201) 352-2694
Fax: (201) 617-0030